McCarthy v Town of Massena, N.Y. (Massena Mem. Hosp.) (2023 NY Slip Op 03959)

McCarthy v Town of Massena, N.Y. (Massena Mem. Hosp.)

2023 NY Slip Op 03959

Decided on July 27, 2023

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:July 27, 2023

535178 
[*1]Jessica McCarthy, as Administrator of the Estate of Jay F. McCarthy, Deceased, Appellant-Respondent,
v
Town of Massena, New York (Massena Memorial Hospital), Defendant, and Jan Close et al., Respondents, and Brian R. Kerrigan, Defendant and Third-Party Plaintiff-Respondent-Appellant; Nathan Witkop, Third-Party Defendant-Respondent.

Calendar Date:June 1, 2023

Before:Egan Jr., J.P., Lynch, Aarons, Fisher and McShan, JJ.

Campbell & Associates, Hamburg (John T. Ryan of counsel), for appellant-respondent.
Maynard, O'Connor, Smith & Catalinotto, LLP, Albany (Robert A. Rausch of counsel), for Jan Close, respondent.
Monaco Cooper Lamme & Carr, PLLC, Albany (MacKenzie E. Kesterke of counsel), for Canton-Potsdam Hospital and another, respondents.
Phelan, Phelan & Danek, LLP, Albany (Timothy S. Brennan of counsel), for Brian R. Kerrigan, defendant and third-party plaintiff-respondent-appellant.
Gordon Rees Scully Mansukhani, LLP, Harrison (Robert E. Fein of counsel), for Nathan Witkop, third-party defendant-respondent.

Fisher, J.
Cross-appeals from an order of the Supreme Court (Mary M. Farley, J.), entered March 29, 2022 in St. Lawrence County, which, among other things, granted motions by defendants Jan Close, Canton-Potsdam Hospital, St. Lawrence Health Systems and Brian R. Kerrigan for summary judgment dismissing the amended complaint against them.
On April 7, 2015, Jay F. McCarthy (hereinafter decedent) presented to the emergency department of defendant Massena Memorial Hospital (hereinafter MMH) with complaints of left-sided numbness of his entire body, severe headache, blood in urine, incontinence, impaired gait, difficulty in thought processing, elevated blood pressure and pain in the back of his head, neck, left temple, left base of his skull, right occipital area and right base of his skull. Decedent had a previous medical history of alcohol abuse and blood tests confirmed that he arrived at MMH with a blood alcohol content (hereinafter BAC) of .216. While in the emergency department, decedent was attended to by defendant Brian R. Kerrigan, a physician, who performed a physical examination and ordered, among other things, a CT scan without contrast. Although the results of a neurological assessment revealed that decedent had grip weakness on the left side, limited sensation in the left lower extremity, unsteady gait and numbness in his left arm and leg, decedent had normal speech and facial symmetry and the results of the CT scan were negative for a stroke. Kerrigan ultimately diagnosed decedent with peripheral neuropathy, likely Wernicke-Korsakoff syndrome, in the setting of alcohol intoxication, and malnutrition, and discharged him with instructions to follow up with a nearby Veterans Affairs Hospital and enter detox.
Decedent continued to experience abnormal symptoms and, on April 14, 2015, went with his daughter to the emergency department of defendant Canton-Potsdam Hospital, a member of defendant St. Lawrence Health Systems (hereinafter collectively referred to as CPH), complaining of a continued and severe headache, pain alongside the left side of his head and neck, blurred vision and left-sided numbness and tingling. Decedent was attended to by defendant Jan Close, a physician, and advised medical staff that he was recently seen at MMH and that the CT scan performed on him there was negative for a stroke. Close's physical examination revealed that decedent had normal gait, equal and reactive pupils and normal strength and sensation. Close diagnosed decedent with a migraine and administered an injection of Toradol, after which decedent's symptoms lessened. As a result, Close discharged decedent and instructed him to follow up with his primary care physician.
In the week between the emergency department visits, decedent treated with third-party defendant Nathan Witkop, a chiropractor, and received two chiropractic manipulations. After his discharge from Close, on April 22, 2015, decedent returned for chiropractic treatment with Witkop. Following cervical [*2]manipulations from Witkop, decedent got up off the table and started to walk around, then began having labored respirations and collapsed. Decedent was ultimately transferred to the University of Vermont Medical Center (hereinafter UVMC), where he was diagnosed with a bilateral cerebellar stroke and left vertebral artery dissection. He was discharged from UVMC in May 2015.
Decedent commenced this medical malpractice action in August 2015, alleging that he had presented to defendants and Witkop with the symptoms of a stroke, which they failed to properly evaluate and treat. In 2016, decedent and Witkop entered into an arbitration agreement wherein they agreed to resolve decedent's claims insofar as asserted against Witkop. Ultimately, the arbitrator found that Witkop had deviated from the standard of care but was not a substantial factor in causing decedent's injuries. After defendants would not sign the stipulation of discontinuance in his favor, Witkop moved for leave to discontinue the action insofar as asserted against him, which was granted in July 2016. Decedent died in September 2016 due to complications associated with the subject stroke.
Plaintiff, decedent's daughter and administrator of his estate, was substituted for decedent and served a supplemental summons and amended complaint against defendants adding a wrongful death cause of action. Kerrigan then commenced a third-party action against Witkop, asserting a claim for contribution and common-law indemnification. Witkop moved for summary judgment dismissing the third-party complaint, which was denied by Supreme Court. This Court modified such order, dismissing Kerrigan's common-law indemnification cause of action against Witkop (see McCarthy v Kerrigan, 178 AD3d 1342, 1344 [3d Dept 2019]). Following the completion of discovery, defendants Kerrigan, Close and CPH all moved separately for summary judgment dismissing plaintiff's complaint.[FN1] In addition, Kerrigan alternatively moved for partial summary judgment against Witkop on the issue of whether he had deviated from the standard of care. Supreme Court granted Kerrigan's, Close's and CPH's motions and dismissed the amended complaint against them, finding that they met their prima facie burden and plaintiff's expert affidavits were too conclusory and unsupported by the record to raise a question of fact. As a result, the court also denied Kerrigan's motion for partial summary judgment against Witkop as moot. Plaintiff appeals and Kerrigan appeals only from the portion of the order denying his motion as moot.
Initially, Supreme Court found that, because plaintiff failed to comply with the Uniform Rules for Trial Courts (22 NYCRR) former § 202.8-g by serving a proper counter-statement of material facts, all of the factual assertions presented in each defendant's statement of material facts were deemed admitted. This was an error, as we have previously rejected the rigid construction that a trial court must deem factual assertions in [*3]a statement of material fact to be admitted in situations where, like here, a plaintiff failed to respond to that statement in the appropriate manner (see Leberman v Instantwhip Foods, Inc., 207 AD3d 850, 850-851 [3d Dept 2022]). Although it would have been the better practice for plaintiff to submit a paragraph-by-paragraph response to each moving defendant's statement of material facts rather than a general denial, "blind adherence to the procedure set forth in 22 NYCRR 202.8-g is not required if the proof does not support granting summary judgment or the circumstances otherwise warrant a departure from that procedure" (id. at 851 [internal quotation marks and citations omitted]; see also Montgomery v Burlington Coat Factory of Tex., Inc., ___ AD3d ___, ___, 2023 NY Slip Op 03127, *1 [4th Dept 2023]; On the Water Prods., LLC v Glynos, 211 AD3d 1480, 1481-1482 [4th Dept 2022]).[FN2]
Turning to the merits, each moving defendant "bore the initial burden of presenting factual proof, generally consisting of affidavits, deposition testimony and medical records, to rebut the claim of malpractice by establishing that they complied with the accepted standard of care or did not cause any injury to the patient" (Schwenzfeier v St. Peter's Health Partners, 213 AD3d 1077, 1078 [3d Dept 2023] [internal quotation marks, brackets and citations omitted]; see Randall v Kingston Hosp., 135 AD3d 1100, 1101 [3d Dept 2016]). In deciding a motion for summary judgment, the function of the court is not to "make credibility determinations or findings of fact, but rather to identify material triable issues of fact" (Hall v Queensbury Union Free Sch. Dist., 147 AD3d 1249, 1250 [3d Dept 2017] [internal quotation marks and citation omitted]). Turning first to Kerrigan's motion, we agree with Supreme Court that his proof as presented was sufficient to satisfy his prima facie burden that he complied with accepted medical practice or that any such deviation was not the cause of decedent's injuries or death.
In addition to relying on medical records and deposition testimony, Kerrigan relied upon the expert affirmation of Pamela J. Murphy, a board-certified emergency medicine physician, who generally opined that the care provided by Kerrigan on April 7, 2015 was within the standard of care and did not cause any injury to decedent. Specifically, Murphy opined that Kerrigan performed a detailed workup of decedent, including a neurological examination, wherein Kerrigan ordered all necessary and appropriate diagnostic tests, properly considered the possibility of a stroke in his differential diagnosis and took the appropriate steps to rule it out. Murphy particularly found this conclusion appropriate considering decedent's history and medical record, which included alcohol abuse and presently reflected a BAC of .216 at the time of examination. As to the type of imaging study, Murphy opined that Kerrigan complied with the accepted standard of care by ordering a CT scan without contrast [*4]and that the standard of care did not require an emergency MRI or MRA before discharge. To that end, Murphy stated that, as an emergency department provider, Kerrigan lacked the qualifications to interpret a CT scan and appropriately relied on the radiologist's interpretation of the scan. Lastly, Murphy opined that, based on decedent's subsequent treatment records, he suffered the vertebral artery dissection and stroke "just moments" after Witkop's chiropractic manipulation on April 22, 2015, which was the "ultimate cause" of decedent's injuries.
Similarly, we also find that Close and CPH met their prima facie burden for summary judgment as it relates to their care of decedent, which occurred on April 14, 2015. In addition to relying on the medical records and deposition testimony, each defendant also relied on the expert affidavit of Curtis B. Benesch, a board-certified vascular neurologist, who opined that Close and CPH fully complied with their standard of care by properly assessing and examining decedent based on his history, a physical examination and a neurological assessment. According to Benesch, the diagnoses of migraine headache and cervical sprain/strain made by Close and CPH staff were consistent with decedent's symptoms and presentation, particularly given that the administration of Toradol resulted in an improvement of decedent's symptoms within half an hour after the injection. Further based on decedent's presentation, Benesch opined that decedent "did not have signs or symptoms consistent with a diagnosis of stroke or [transient ischemic attack]" and, therefore, the standard of care did not require ordering additional consultations, diagnostic testing or radiological studies. Benesch specifically stated that it was not unreasonable for Close or CPH to rely on decedent's description of his prior treatment at MMH and the radiologist's findings from the prior CT scan, nor was it a deviation in not obtaining the actual records from MMH. Furthermore, Close and several nurses from CPH submitted affidavits in support, averring that decedent was alert, awake, responsive to questions, oriented to time and place, did not slur or misuse words, that his strength was normal, his gait steady and that he had normal facial symmetry.
As the moving defendants met their prima facie burden, "the burden shifted to plaintiff to present expert medical opinion evidence that there was a deviation from the accepted standard of care and that this departure was a proximate cause of decedent's injury" (Schwenzfeier v St. Peter's Health Partners, 213 AD3d at 1080 [internal quotation marks, brackets and citation omitted]; see D'Orta v Margaretville Mem. Hosp., 154 AD3d 1229, 1233 [3d Dept 2017]). In opposition to defendants' motions, plaintiff relied on the medical records, deposition testimony, and three affirmations from experts alleging deviations from the standard of care against each defendant and causation. Specifically, plaintiff proffered an affidavit [*5]of Jordan Haber, a board-certified radiologist, who opined that large and multiple left cerebellar and/or brainstem infarcts were clearly visible on the CT scan taken during decedent's presentation to MMH on April 7, 2015. He continued that these infarcts were medically confirmed by an MRI on April 22, 2015, and further opined that decedent's complaints of left arm and left leg numbness and headache were consistent with a cerebral ischemic event from April 7, 2015 through April 22, 2015 — the entire relevant time period of each defendant's treatment of decedent. Such opinion directly contradicts that of Benesch in support of Close's and CPH's motions, inasmuch as Benesch opined that decedent did not present with any signs or symptoms of a stroke or ischemic event.
Plaintiff also proffered in opposition the affirmation of Ronald A. Paynter, a board-certified emergency medicine physician, who opined that decedent's presentation required a stroke workup to be completed and that a CT scan is not a definitive test to rule out a stroke. Specifically, Paynter opined that an emergency medicine physician must use a patient's presentation and symptoms to develop a differential diagnosis and then rule out the most harmful possible injuries or diagnoses that are identified from this process to ensure that further harm is not continued. As it relates to both Kerrigan and Close, Paynter opined that both physicians breached the accepted standard of care by not referring decedent to a neurologist or stroke specialist on each defendant's respective treatment dates. As it particularly relates to Kerrigan, Paynter opined that decedent presented with "classic stroke symptoms" and the failure to include a stroke as a differential diagnosis or refer decedent to a specialist, and to solely rely on a CT scan to rule out a stroke in such setting, was outside the standard of care. Paynter noted that the main purpose of a CT scan was to rule out a hemorrhagic stroke, as Kerrigan testified during his deposition that he was seeking to rule out an intracranial bleed, but that a CT scan was not the proper test to view an ischemic stroke like the one that decedent was suffering from. Further, Paynter undermined Kerrigan's finding of Wernicke-Korsakoff syndrome as a possible diagnosis, as he explained that it is typically treated with a "simple" administration of thiamine and niacin, which was not given to decedent here.
As it relates to Close and CPH, Paynter similarly opined that Close failed to meet the accepted standard of care by failing to obtain a history from decedent, by failing to include stroke in his differential diagnosis and by failing to refer decedent to a specialist. Despite that decedent had a CT scan completed the week before, decedent's symptoms continued and were indicative of a stroke, based on which, as Paynter explained, Close's failure to order any imaging study to rule out a stroke and his failure to consult with a neurologist were also outside the standard [*6]of care. Paynter opined that, had Kerrigan, Close and CPH properly diagnosed and/or referred decedent to a stroke specialist or neurologist, decedent would have been instructed to avoid trauma to the neck such as chiropractic manipulation. Specifically, he opined that, on April 7, 2015, decedent was suffering from a vertebral artery dissection and/or stroke and the proper diagnosis of same would have prevented the chiropractic manipulations which ultimately resulted in further damage. Relevantly, Paynter also noted that long-standing alcohol use made decedent more vulnerable to a stroke, information Close and Kerrigan should have used when formulating a differential diagnosis.
Moreover, plaintiff also provided in opposition an affirmation from Jeffrey M. Katz, a board-certified neurologist, who opined that decedent was suffering from multiple cerebellar and/or brainstem infarcts from April 6, 2015 through April 22, 2015, as medically confirmed by the MRI on April 22, 2015. However, decedent had not been properly diagnosed by any healthcare professional during this time period, yet a proper diagnosis and treatment would have prevented further damage and a subsequent ischemic event from causing additional damage to decedent. As it relates to the location of the blood vessel where the vertebral artery dissection occurred, Katz explained that it was near vertebra C-2 and consistent with the damage caused by the artery coming across the bony arch of this vertebra during the rapid rotation of the neck from a cervical spinal manipulation. He stated that decedent's neck pain, head pain and other symptoms were indicative of a vertebral artery dissection on April 7, 2015, which was not properly evaluated through appropriate imaging studies and was not treated with medications that would have "significantly decreased" decedent's chance of further damage from chiropractic manipulations. Katz further opined that, given that decedent was suffering from an undiagnosed stroke, he was at a "considerable heightened risk for further cerebrovascular injury and resultant brain injury" when he went to Witkop on April 22, 2015. To that end, he explained that the "vast majority" of patients suffering from an ischemic stroke due to a vertebral artery dissection do not experience any sort of exacerbation or subsequent stroke without additional trauma once they have been placed on the proper stroke-preventative medication. Katz concluded that decedent's hospitalization at UVMC and severe disability resulting in his death were a result of Kerrigan's, Close's and CPH's failure to diagnose a stroke and/or vertebral artery dissection and/or their failure to refer decedent to a stroke specialist during their time of treatment on April 7, 2015 and April 14, 2015.
Based on the foregoing, when viewed in a light most favorable to plaintiff, we find that the record raises several questions of fact as to whether each defendant satisfied the standard of care applicable to him or it[*7](see Schwenzfeier v St. Peter's Health Partners, 213 AD3d at 1084). Despite that each defendant and their respective experts opined that decedent was not presenting with the signs or symptoms of a stroke, this is belied by the medical record, which establishes that decedent was experiencing a stroke and/or vertebral artery dissection during the relevant time period that they treated decedent and presented with the "classic" symptoms associated with a stroke. At a minimum, these differing opinions create a question of fact, which plaintiff's experts highlighted in so far that each defendant deviated from the standard of care by failing to refer decedent to a specialist or neurologist (see id.; Colon v Choi, 192 AD3d 1442, 1443-1444 [3d Dept 2021]; see also Fischella v Saint Luke's Cornwall Hosp., 204 AD3d 1343, 1344-1345 [3d Dept 2022]; D.Y. v Catskill Regional Med. Ctr., 156 AD3d 1003, 1005 [3d Dept 2017]). Although Kerrigan attempts to distinguish himself from MMH by contending that it was reasonable for him to rely on the radiologist's report of the CT scan, this ignores the fact that he allegedly failed to provide a proper stroke workup and that his purported diagnosis of Wernicke-Korsakoff syndrome is undermined by his failure to treat decedent for same. Similarly, although Close and CPH contend that they were not required to obtain Kerrigan and MMH's medical records, plaintiff's experts established that their failure to perform any imaging studies was a deviation from the standard of care (see Schwenzfeier v St. Peter's Health Partners, 213 AD3d at 1084). Accordingly, we disagree with Supreme Court that such opinions were conclusory and based on speculation or unsupported by competent evidence (see Goldschmidt v Cortland Regional Med. Ctr., Inc., 190 AD3d 1212, 1216 [3d Dept 2021]; compare Caulkins v Vicinanzo, 71 AD3d 1224, 1226 [3d Dept 2010]), particularly given the nature of such allegations being premised on omissions and the concerted opinions of plaintiff's experts echoing the same deviations for each emergency medicine physician and department in a manner referencing the relevant medical record (see Tardi v Casler-Bladek, 212 AD3d 904, 906 [3d Dept 2023]; Frank v Smith, 127 AD3d 1301, 1303 [3d Dept 2015]).
Similarly, plaintiff's experts also established a question of fact as it relates to causation. Notably, Paynter and Katz opined that the failure of Kerrigan on April 7, 2015, and of Close and CPH on April 14, 2015, to make a diagnosis of a stroke and/or vertebral artery dissection before decedent went to Witkop on April 22, 2015, was a direct cause of his subsequent ischemic event, severe disability and ultimately his death (see D'Orta v Margaretville Mem. Hosp., 154 AD3d at 1233; see also Holland v Cayuga Med. Ctr. at Ithaca, Inc., 195 AD3d 1292, 1295 [3d Dept 2021]; D.Y. v Catskill Regional Med. Ctr., 156 AD3d at 1005; Neyman v Doshi Diagnostic Imaging Servs., P.C., 153 AD3d 538, 545-546 [2d Dept 2017]). Furthermore, given the failure [*8]to diagnose decedent's stroke and/or vertebral artery dissection and the strong contraindications associated with chiropractic manipulations, plaintiff further raised a question of fact as to whether such diagnosis and treatment would have improved or entirely prevented his injuries as related to his subsequent treatment by Witkop on April 22, 2015 (see D'Orta v Margaretville Mem. Hosp., 154 AD3d at 1233; Randall v Kingston Hosp., 135 AD3d at 1104). Accordingly, Supreme Court erred in granting summary judgment in favor of Kerrigan, Close and CPH, and the amended complaint is reinstated against each respective defendant.
Lastly, Supreme Court denied as moot Kerrigan's motion for partial summary judgment against Witkop. In view of our decision herein, this motion is no longer moot. As such, upon remittal Supreme Court must determine the motion that was denied as moot (see Klepanchuk v State of N.Y. Dept. of Transp., 189 AD3d 2102, 2105 [4th Dept 2020]; Lewis v DiMaggio, 151 AD3d 1296, 1300 [3d Dept 2017]; Richardson v Kempney Trucking, 12 AD3d 1099, 1100 [4th Dept 2004]). We have examined the parties' remaining contentions and have found them to be without merit or rendered academic.
Egan Jr., J.P., Lynch, Aarons and McShan, JJ., concur.
ORDERED that the order is modified, on the law, with costs to plaintiff, by reversing so much thereof as granted the motions of defendants Jan Close, Canton-Potsdam Hospital, St. Lawrence Health Systems and Brian R. Kerrigan for summary judgment dismissing the amended complaint; such motions denied; matter remitted to the Supreme Court for further proceedings not inconsistent with this Court's decision; and, as so modified, affirmed.

Footnotes

Footnote 1: MMH also moved for summary judgment, which was denied by Supreme Court. Although MMH filed a notice of appeal, it failed to timely perfect same, which was deemed dismissed on January 12, 2023 (see Rules of App Div, All Depts [22 NYCRR] § 1250.10 [a]).

Footnote 2: Notably, this section was amended during the pendency of this appeal to require a trial court to give notice and afford an opportunity to cure before deeming the assertions admitted, ameliorating situations such as in this matter (see Uniform Rules for Trial Cts [22 NYCRR] § 202.8-g [e], as amended by Court Notices [Judiciary, Notices of Adoption, 44 NY Reg 99] [July 6, 2022]).