**Matney v Boyle**

2024 NY Slip Op 30001(U)

January 2, 2024

Supreme Court, Saratoga County

Docket Number: Index No. EF20211351

Judge: Richard A. Kupferman

Cases posted with a "30000" identifier, i.e., 2013 NY Slip Op 30001(U), are republished from various New York State and local government sources, including the New York State Unified Court System's eCourts Service.

This opinion is uncorrected and not selected for official publication.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF SARATOGA

THOMAS R. MATNEY AND KATHY MATNEY,

Plaintiffs,

-against-

SEAN P. BOYLE, M.D.,
THE SARATOGA HOSPITAL, AND
SARATOGA HOSPITAL MEDICAL GROUP,

Defendants.

**DECISION AND ORDER**

**Index No.: EF20211351**

Appearances:

Victor L. Mazzotti, Esq.
Thomas J. Mortati, Esq.
Harding Mazzotti LLP
Albany, New York
*Attorneys for the Plaintiffs*

Kathleen A. Barclay, Esq.
Samantha V. Vedder, Esq.
O'Connor, O'Connor, Bresee & First, P.C.
Albany, New York
*Attorneys for the Defendants*

KUPFERMAN, J.:

In this action, the plaintiff, Thomas Matney, asserts claims against the defendant physician ("Dr. Boyle") and a hospital/medical group for medical malpractice, lack of informed consent, and negligence. He alleges that he sustained a right ureteral injury during a surgery performed by Dr. Boyle and that Dr. Boyle failed to timely diagnose/treat the injury. After discovery, the defendants filed a motion seeking summary judgment dismissing the complaint. As discussed below, the main issue in dispute is whether the affirmation of the plaintiffs' expert creates a material issue of fact for trial on the malpractice claim.

1

## Background

Mr. Matney was diagnosed with chronic sigmoid diverticulitis. As part of his treatment, he underwent a laparoscopic sigmoid colectomy on February 21, 2020.[1] Dr. Boyle performed the surgery with the assistance of a resident physician. During the procedure, Dr. Boyle encountered severe inflammation of the distal sigmoid colon with adhesions to the anterior pelvis. Due to the severity and difficulty navigating the inflammation anteriorly, Dr. Boyle asked another surgeon, Dr. Bell, to assist him in the surgery. They elected to proceed using a laparoscopic gel port and a hand assisted laparoscopic procedure. The surgery was documented in medical notes/records prepared by Dr. Boyle. These records do not report the occurrence of any injuries or complications during the surgery.

After the procedure, Mr. Matney remained at the hospital for observation and monitoring. After several days (beginning on February 26), Dr. Boyle suspected that Mr. Matney may have sustained a possible injury from the surgery. He ordered a creatinine level test to check for a urine leak.[2] He also ordered a cystogram to check the integrity of the bladder.

The cystogram was negative for a leak from the bladder. The results of the fluid evaluation came back with a creatinine level above the normal average and suggested a urine leak. Upon receipt and review of the fluid creatinine results, Dr. Boyle consulted with urology specialists and a CT scan was ordered for the pelvis. The CT scan (performed on February 28) demonstrated disruption of the distal right ureter at approximately 4 cm proximal to the bladder.

---

[1] The surgery also involved the mobilization of the splenic flexure.

[2] Saratoga Hospital did not have the capabilities of performing the creatinine level test at its facility. As such, the sample was sent to Albany Medical Center for evaluation.

On February 29, Mr. Matney underwent a cystoscopy/ureteroscopy procedure performed by Dr. Yamada, where it was determined that Mr. Matney had a partial right ureteral injury with urine leak. During that procedure, Dr. Yamada discovered what he described as an apparent thermal injury to the right ureter. Dr. Yamada attempted to place a stent running from the bladder through the partially disrupted ureter, into the kidney, which would allow the ureter to heal on its own. This, however, was unsuccessful. On March 2, Dr. Tao also attempted to place a stent in the right ureter. However, this procedure was also unsuccessful. Dr. Tao ultimately placed a nephrostomy tube (a tube placed into the kidney to drain urine directly from the kidney into an external bag) without incident. Mr. Matney was ultimately discharged from the hospital on March 4, 2020. He received outpatient treatment and eventually recovered from the injury.

During their depositions, Dr. Boyle and Dr. Bell testified that they did not know the reason for the injury. Dr. Boyle opined that it could have likely been caused by a fistula. Dr. Bell opined that the diverticulitis and the inflammation could have possibly caused some type of adherence to the ureter and that an inadvertent injury can occur during the process of separating the colon away from inflamed tissues around the ureter.

Dr. Boyle testified that he inspected the ureters throughout the procedure, as noted in the medical records. He explained that he identified the ureters at about the level of the pelvic brim and that, at that point, they were protected and identified. He further explained that surgeons cannot see the full length of the ureter and that the ureter becomes difficult to visualize more distally or further down toward the bladder.

According to Dr. Boyle, he inspected the right ureter before Dr. Bell's involvement in the surgery, as noted in the medical records. He further explained that he then continued to inspect the ureters thereafter, even though the later portion of his medical report only mentions the word

3

[* 3]

"ureter" rather than "ureters."[3] He explained that it was his "routine practice to visualize ureters throughout the procedure at the level of the pelvic brim where they are most superficial." He explained that this area is where the ureters "can be seen and easily identified." He further agreed with the plaintiffs' counsel that the subject injury was not in that location.

Dr. Boyle confirmed that he did not do anything before concluding the surgery to inspect or test the ureters to determine whether there had been an injury "lower or more distal to the area [he had been] just referring to" (apparently, lower than the area of the injury or lower than where the ureters can be seen and easily identified) (see Boyle Transcript, at pages 53-54). He explained that it would not be standard practice to check the integrity of the ureters during the surgery beyond visual inspection unless a surgeon had a suspicion that there was an injury to the ureter during the procedure itself.

Dr. Bell similarly testified that surgeons cannot typically identify the ureter for its entire length given how the ureter courses in the pelvis. He agreed that identification of the ureter should be under direct visualization and should be frequently repeated. He further explained that this was done in this particular case based on his review of Dr. Boyle's medical records. Dr. Bell also agreed that it would be good and accepted practice to inspect the operative field for injuries before concluding surgery "to the extent that it's possible." He did not know if before concluding the surgery that either he or Dr. Boyle inspected the right ureter to determine whether it was free from injury. He did not see a specific reference to this in the medical records. He also did not have an independent recollection of the details of the surgery.

---

[3] Dr. Boyle testified, as follows: "I continued to identify the ureters at about the level of the pelvic brim where they can be seen throughout the procedure, [which] is my routine practice to do so" (Boyle Transcript, at page 49).

4

After discovery, the defendants filed a motion seeking summary judgment dismissing the complaint. In support, the defendants have submitted medical records, deposition transcripts, and an affirmation from their expert (a highly qualified surgeon). In opposition, the plaintiffs have submitted an affirmation from their expert (also a highly qualified surgeon). The defendants have also submitted a reply affirmation from their expert.

## Analysis

## The Malpractice Claim

A defendant physician seeking summary judgment in a medical malpractice action bears "the initial burden of presenting factual proof, generally consisting of affidavits, deposition testimony and medical records, to rebut the claim of malpractice by establishing that [he or she] complied with the accepted standard of care or did not cause any injury to the patient" (Schwenzfeier v St. Peter's Health Partners, 213 AD3d 1077, 1078 [3d Dept 2023] [internal quotation marks, brackets, and citations omitted]). If the defendant satisfies this standard, the burden then shifts to the plaintiff to "present expert medical opinion evidence that there was a deviation from the accepted standard of care and that this departure was a proximate cause of [the] injury" (id. at 1080 [internal quotation marks and citations omitted]). "[E]xpert opinions that are conclusory, speculative, or unsupported by the record are insufficient to raise triable issues of fact" (Longhi v Lewit, 187 AD3d 873, 878 [2d Dept 2020] [internal quotation marks and citation omitted]; see Schwenzfeier, 213 AD3d at 1080-1083). "In order not to be considered speculative or conclusory, expert opinions in opposition to a physician's motion for summary judgment should address specific assertions made by the physician's experts, setting forth an explanation of the reasoning and relying on specifically cited evidence in the record" (Schwenzfeier, 213 AD3d at 1080 [internal quotation marks, brackets, and citation omitted]).

5

[* 5]

## A. The Cause of the Right Ureter Injury

The materials submitted by the defendants in support of their motion readily satisfy their initial burden of demonstrating that they are not liable for causing the injury itself (see e.g. id. at 1077; Humphrey v Riley, 163 AD3d 1313 [3d Dept 2018]; Henry v Duncan, 169 AD3d 421 [1st Dept 2019]; Khosrova v Westermann, 109 AD3d 965 [2d Dept 2013]; Martino v Miller, 97 AD3d 1009 [3d Dept 2012]; Rossi v Arnot Ogden Med. Ctr., 268 AD2 916 [3d Dept 2000]). The medical records from Dr. Boyle submitted in support of the motion explain the procedures performed and do not identify any resulting complications or injuries from the surgery. In addition, Dr. Boyle and Dr. Bell both testified that they did not know the reason for the injury and that it could have occurred for reasons other than surgical error. The defendants' expert has further opined in his affirmation that Dr. Boyle did not deviate from accepted standards of care or proximately cause the alleged injuries. He opines that the surgery was appropriate, and that Dr. Boyle performed the surgery in accordance with the standard of care. He further opines that no evidence exists that any direct injury to the ureters occurred during the surgery and that there was no leakage of urine in the operative field noted during the surgery.

The defendants' expert further explains that damage to adjacent structures, such as ureters, is a known complication of a laparoscopic sigmoid colectomy procedure. In his opinion, the injury was caused by a delayed thermal injury, which is a known risk. As he explains, the electricity from the harmonic scalpel can cause thermal energy to spread to adjacent tissue causing a delayed thermal spread injury that is not apparent initially. The spread of thermal energy essentially interrupts the blood supply and causes the tissue to slowly break down. According to the defendants' expert, "a thermal spread injury is a delayed injury that often does not manifest itself

6

immediately intraoperatively with signs such as blanching or immediate color and texture changes of the tissue, because the tissue was not directly contacted."

In opposition, the plaintiffs rely on an affirmation from their expert, who opines that Dr. Boyle deviated from the standard of care and proximately caused the injuries. The plaintiffs' expert opines that the right ureteral injury was not a delayed thermal injury as the defendants' expert opines, but "more likely" a direct thermal injury from use of the harmonic scalpel. In the alternative, the plaintiffs' expert opines that if a delayed thermal injury occurred, it would have been caused by "improper surgical technique" by allowing the harmonic scalpel to come too close to the ureter and/or for too long.

The plaintiffs' expert opines that Dr. Boyle should not have been operating in that portion of the ureteral anatomy where the injury occurred. He opines that Dr. Boyle "failed to visualize, protect and later inspect the right ureter, which was a deviation from the standard of care." He also asserts that Dr. Boyle did not visualize or inspect the area of the ureters where the injury occurred, and he further disputes that "both ureters were confidently identified and protected from harm," as stated in the medical records. He also opines that Dr. Boyle should have "considered … conversion to an open procedure to provide better intraoperative visualization to better protect the ureter[.]"

In the Court's view, the affirmation submitted by the plaintiffs' expert fails to create an issue of fact despite its length (27 pages). The conclusions of the plaintiffs' expert rest on speculation and are not supported by the record. For example, the opinion of the plaintiffs' expert rests primarily on his conclusion that a direct thermal injury occurred. However, it would be irrational and speculative for a jury to conclude (based on the record presented) that a direct injury occurred or that the injury was more likely than not a direct thermal injury as opposed to a delayed

7

thermal injury (see e.g. Schwenzfeier, 213 AD3d at 1077; Humphrey, 163 AD3d at 1313; Henry, 169 AD3d at 421; Peluso v C.R. Bard, Inc., 124 AD3d 1027 [3d Dept 2015]; Khosrova, 109 AD3d at 965; Martino, 97 AD3d at 1009; De Jesus v Mishra, 93 AD3d 135 [1st Dept 2012]; Melendez v Parkchester Med. Servs., P.C., 76 AD3d 927 [1st Dept 2010]; Myers v Ferrara, 56 AD3d 78 [2d Dept 2008]; Rossi, 268 AD2d at 916; Douglass v Gibson, 218 AD2d 856 [3d Dept 1995]; Lipsius v White, 91 AD2d 271 [2d Dept 1983]).

As explained by the defendants' expert, no evidence exists in the record to support the assumption by the plaintiffs' expert that a direct injury occurred. Neither Dr. Boyle nor Dr. Bell testified that any such direct injury occurred. In fact, they did not know the reason for the injury. In addition, there is nothing reported in Dr. Boyle's medical records about any direct injury.[4] Further, neither Dr. Yamada's subsequent reports nor any of the other medical records relied upon by the experts offer any opinion or indication that the injury was a direct injury or that it occurred from direct contact with the harmonic scalpel. Accordingly, the plaintiffs' expert opinion that a direct thermal injury occurred (as well as his inference that Dr. Boyle directly contacted the injured area with the harmonic scalpel and did not report it) rests on pure speculation and lacks any evidentiary foundation.

The Court also finds speculative the alternative conclusion of the plaintiffs' expert that, if Mr. Matney suffered a delayed thermal injury, it would have been the result of "improper surgical technique." This theory rests on the conclusion that Dr. Boyle placed the harmonic scalpel too close to the ureter or for too long. Such an opinion improperly assumes facts not in evidence. The

---

[4] The defendants' expert avers that "surgeons have a duty to accurately document every surgical procedure they perform, including complications that arise during the procedure" and that "[d]irectly contacting a ureter with a harmonic scalpel during the course of a laparoscopic sigmoid colectomy would have been a complication of the surgery that Dr. Boyle would have been required to document in his operative notes."

8

plaintiffs' expert also improperly reaches this conclusion without adequately addressing the reason for the surgery and the particular circumstances encountered by Dr. Boyle during the surgery. In addition, the plaintiffs' expert fails to reasonably define "proper surgical technique" or explain what technique could have been employed under the facts of this particular surgery that could have prevented the injury (see e.g. Byrne v Sidhu, 215 AD3d 622 [2d Dept 2023]; Palazzolo v Green, 189 AD3d 1056 [2d Dept 2020]; Humphrey, 163 AD3d at 1313; Webb v Albany Med. Ctr., 151 AD3d 1435 [3d Dept 2017]; Pancila v Romanzi, 140 AD3d 516 [1st Dept 2016]; Peluso, 124 AD3d at 1027; Martino, 97 AD3d at 1009; Passero v Puleo, 17 AD3d 953 [3d Dept 2005]; Fhima v Maimonides Med. Ctr., 269 AD2d 559 [2d Dept 2000]; Douglass, 218 AD2d at 856).

Moreover, to the extent that the plaintiffs' expert assumes malpractice based on the location of the injury, such an assumption similarly ignores the record. In particular, the plaintiffs' expert fails to consider that Dr. Boyle encountered significant inflammation and scar tissue during the procedure as a result of the longstanding history of diverticulitis with known flare-ups, which required Dr. Boyle to dissect and break apart adhesions in the area where the injury occurred. The plaintiffs' expert also ignores that the anatomy is all within centimeters of each other and even closer with the presence of inflammation (see e.g. Schwenzfeier, 213 AD3d at 1077; Humphrey, 163 AD3d at 1313; Peluso, 124 AD3d at 1027; Martino, 97 AD3d at 1009; Monge v Queens-Long Is. Med. Group, P.C., 55 AD3d 341 [1st Dept 2008]; Fhima, 269 AD2d at 559; Rossi, 268 AD2d at 916).

Further, to the limited extent that the plaintiffs' expert acknowledges these circumstances, he appears to offer only generalized opinions about the alleged inappropriateness of the procedures performed and the availability of other procedures. His discussion on these matters is extremely vague, and his opinions lack sufficient details to rationally reach any conclusions sufficient to

9

impose liability on Dr. Boyle for his alleged failure to engage in a different method of surgery. There is no foundation or basis in the record to reach such conclusions. In addition, to the extent that the plaintiffs' expert assumes that Dr. Boyle may have negligently caused the injury by operating in an area in which he could not fully visualize, he again assumes that Dr. Boyle directly (and blindly) contacted the injured area with the harmonic scalpel, which again is a fact not in evidence.

Further, the Court is not persuaded that a triable issue of fact exists on causation simply because Dr. Boyle testified that he believes that the injury was more likely than not the result of a fistula. This possible explanation for the injury does not favor the plaintiffs' case and, in fact, simply presents another possible non-negligent reason for the injury.

## B. The Alleged Delay in Diagnosis/Treatment

Regarding the alleged delay in the diagnosis/treatment of the injury, the defendants similarly submitted sufficient proof to meet their initial burden. Among other things, the defendants' expert opines that a delayed thermal injury often does not manifest itself immediately and therefore could not have been detected by visualization, testing, or inspection during the surgery. Furthermore, the defendants' expert opines that Dr. Boyle provided appropriate care after the surgery. He explains that Dr. Boyle approximately considered the quantity of the fluid being drained after the surgery. He opines that such amount was not concerning given the amount of irrigation used during the surgery and other factors, including the decline in the amount of the fluid on one of the days. He further opines that when evidence of a potential intraoperative injury arose, Dr. Boyle ordered appropriate testing to evaluate for injury, including a cystogram, a CT of the abdomen and pelvis, and the creatinine lab order. In addition, the defendants' expert opines that even if the delayed thermal spread injury was diagnosed earlier in the postoperative course, the

10

postoperative course would have been substantially similar, if not the same.

In opposition, the plaintiffs' expert focuses almost exclusively on Dr. Boyle's alleged failure to discover the injury during the surgery rather than after it. He opines that diagnosis and treatment of the injury during the surgery would have had a more accurate and beneficial prognosis. The plaintiffs' expert does not directly dispute that thermal spread injuries "often" do not manifest themselves immediately, as opined by the defendants' expert. However, the plaintiffs' expert attempts to dissect this opinion by noting that such injuries may "at times" manifest themselves immediately, particularly where the harmonic scalpel has come in close contact with the anatomic structure that was injured.

The plaintiffs' expert further opines that the standard of care required inspection and visualization of the ureter for injury and, where it is not possible, testing should be performed during surgery. He also opines that "Dr. Boyle admittedly failed to inspect the right ureter for intraoperative injury prior to completing the surgery per his testimony" (citing Boyle Transcript, at pages 53-54). He further concludes that "Dr. Boyle never even looked [at] or inspected the right ureter after the point in the surgery where the harmonic scalpel was used in the area where the thermal injury was later found."

The plaintiffs' expert further opines that Dr. Boyle should have realized that his patient was at high risk for an intraoperative injury given his admitted lack of ability to visualize the ureter. He opines that under these circumstances, the standard of care required Dr. Boyle to "check for ureteral injury via intraoperative cystoscopy and/or intraoperative urologic consultation which would have detected the ureteral injury at the time of surgery." He opines that given that Dr. Boyle could not visualize the area where the injury occurred and made no effort to inspect or protect the ureter, Dr. Boyle should have been "on alert that a thermal injury can occur and, therefore, in this

11

situation the standard of care [required] intraoperative cystoscopy to ensure the integrity of the ureter and, if a ureteral injury [was] found, call[ed] for intraoperative urologic consult and stenting to address the injury then and there." He later adds that the standard of care also required testing such as a methylene blue bladder test.

The Court disagrees with the plaintiffs' contention that Dr. Boyle's testimony creates a material issue of fact on whether he deviated from the standard of care in his visualization of the ureters. Dr. Boyle's medical notes and transcript indicates that he visualized the ureters throughout the procedure to the extent possible. Moreover, while the plaintiffs' expert asserts that the visual inspection was deficient and that Dr. Boyle should have visualized more often, the Court considers such theories as highly speculative. Indeed, the plaintiffs' expert selectively quotes from Dr. Boyle's transcript, and misplaces reliance on pages 53-54.

The questioning relied upon by the plaintiffs' expert was extremely vague and limited. It does not evidence any fatal admissions on liability by Dr. Boyle. Rather, Dr. Boyle simply confirmed that visualization of the entire ureter was not possible and that prior to concluding the surgery he did not test or further inspect a "lower or more distal" area. The plaintiffs' expert fails to explain what measures Dr. Boyle should have (or could have) taken to visualize or inspect the area of the injury more thoroughly. He simply assumes that such additional visualization or inspection was possible. As explained above, he also fails to explain or establish a proper foundation upon which one could conclude that the surgical method utilized by Dr. Boyle was inappropriate or that the failure to perform an alternative method constituted malpractice.

The Court is also highly suspect of the plaintiffs' contention that the standard of care required testing during the surgery to check the integrity of the ureters. The defendants' expert explained that the standard of care did not require testing unless the surgeon suspected an injury.

12

The testimony of Dr. Boyle and Dr. Bell supports this opinion, and neither physician testified that any such testing was indicated. Based on their testimony and the medical records, neither had any suspicion or indication at the time that an injury had occurred. There was no reported urine in the operative field or any other objective basis to suspect that the ureter had been damaged. There is also no evidence that the injury manifested itself during the surgery. Such testing would have also prolonged the time the patient was under anesthesia and presumably could have created additional risks for the patient.

The plaintiffs' expert fails to adequately address these issues and provides limited explanations for his opinion that such testing was required. In fact, his opinion is not supported by any evidence that an injury was suspected or indicated. Rather, his opinion rests largely on his conclusion that Dr. Boyle placed the harmonic scalpel "too close" to the injured area and did not adequately visualize the ureters or make any effort to inspect or protect them. The record, however, does not support any such finding, as discussed above. Accordingly, the Court considers the opinion of the plaintiffs' expert on this issue as conclusory, speculative, and lacking a proper evidentiary foundation (see e.g. Bogin v Metz, 180 AD3d 404 [1st Dept 2020] [holding that "malpractice cannot rest solely on 20/20 hindsight"]; Humphrey, 163 AD3d at 1313; De Jesus, 93 AD3d at 135; Myers, 56 AD3d at 78; Douglass, 218 AD2d at 856).

Nonetheless, even assuming for the sake of argument that such testing should have been performed, it would be too speculative to conclude that such testing during the surgery would have indicated that an injury existed at the time. As the defendants' expert explains, a delayed thermal injury often does not manifest itself until after the surgery is completed. There was no reported observation of any urine in the operative field during the surgery. Nor is there any foundation in the record to rationally conclude that the injury or urine leak manifested itself during the surgery.

13

Based on these facts, the slight possibility and extremely low probability that the injury could have been discovered during the surgery on a closer inspection or with additional testing is simply too remote and speculative to support a finding of liability (see e.g. Humphrey, 163 AD3d at 1313; Biondi v Behrman, 149 AD3d 562 [1st Dept 2017]; Myers, 56 AD3d at 78; Brown v Bauman, 42 AD3d 390 [1st Dept 2007]).

Further, the plaintiffs' expert does not adequately address the circumstances discussed by the defendants' expert in concluding that Dr. Boyle timely diagnosed the injury after the surgery. For example, the plaintiffs' expert seems to suggest that Dr. Boyle did not adequately consider the quantity of the fluid drained after the surgery. However, he fails to discuss the amount of irrigation used during the surgery and other factors (such as a reduction in the quantity on one of the days), which Dr. Boyle and his expert relied upon to conclude that the amount of the initial drain was not concerning at the time. He also seems to suggest that Dr. Boyle failed to consider the possibility of a ureter injury when he was considering the possibility of a bladder injury. However, this is not supported by the record. The creatinine lab ordered and the subsequent follow up care provided indicate that Dr. Boyle properly considered the possibility of a ureter injury as well. The plaintiffs' expert also does not appear to dispute that the alleged delay after the surgery in diagnosing the injury would not have resulted in any different treatment or results.

Moreover, the two appellate court cases relied upon by the plaintiffs involving ureter injuries are factually distinct (see e.g. Bhuiyan v Germain, 211 AD3d 667 [2d Dept 2022]; Majid v Cheon-Lee, 147 AD3d 66 [3d Dept 2016]). In Bhuiyan, for example, the patient underwent a hysterectomy for abnormal uterine bleeding. There, the surgery involved vessel transection, and the patient's left ureter was allegedly severed during the surgery. An increased risk of injury also presented itself based on the patient's dilated cervix and bleeding on the patient's left-hand side.

14

There, the Second Department found that a triable issue of fact existed based on the record presented and the expert proof submitted.

Also, in Majid, the patient underwent surgery to remove her uterus, left ovary, and left fallopian tube. The patient alleged that the surgeon was negligent in performing the surgery and in failing to detect or diagnose a blocked or collapsed ureter. There, the physician was apparently concerned during the surgery about possible damage to the patient's left ureter based on the type of testing performed. The patient's expert opined that the testing performed was insufficient, that proper testing (i.e., an examination of the lining of the bladder and the ureter for potential damage) would have revealed that the ureter was blocked/collapsed, and that a timely diagnosis would have prevented the patient from later losing a kidney. Again, based on the record and the expert proof, the Third Department concluded that a rational juror could find in favor of the plaintiff.

Here, this case does not involve the same surgical procedures as the surgeries performed in these other cases. Nor does this case involve a direct severance/cut of the ureter, a blocked/collapsed ureter, or a situation where testing would have likely discovered the injury during the surgery. Rather, this case involves an alleged thermal injury from a harmonic scalpel, severe inflammation encountered during a colectomy, the delayed manifestation of the injury, and a very low possibility that any testing would have discovered the injury during the surgery. In addition, unlike in these other cases, the expert proof from the plaintiffs in this case is speculative and not supported by the record. In fact, the only similarity between this case and the ureter cases cited by the plaintiffs appears to be that the patients all suffered ureteral injuries. This fact alone, however, does not create an issue of fact for trial. Indeed, the injury itself cannot be the only basis to conclude that malpractice occurred (see Henry v Duncan, 169 AD3d 421 [1st Dept 2019]; see

15

[* 16]

also Golden v Pavlov-Shapiro, 138 AD3d 1406 [4th Dept 2016] [summary judgment granted in favor of the defendants in a ureteral injury case involving a colectomy]).

Accordingly, no triable issue of fact is presented on the medical malpractice claim. This claim is therefore dismissed.

## The Remaining Claims

The remaining claims also do not present a triable issue of fact. Regarding the informed consent claim, Dr. Boyle's testimony and the medical records demonstrate that Mr. Matney was informed of the risks of the surgery, including the possibility of an injury to his ureters. Mr. Matney further signed a consent form stating that he had been informed of the risks. In addition, Mr. Matney does not dispute that he was informed of the risk of injury to his ureters or that he signed the consent form. He simply does not recall discussing the risks. In addition, the plaintiffs' expert does not address this claim. The plaintiffs' proof is insufficient to create an issue of fact.

To the extent that plaintiffs' counsel asserts that a patient cannot consent to medical malpractice, such a contention is simply duplicative of the malpractice claim. In addition, a lack of informed consent claim requires proof that "a reasonably prudent patient in the same position would not have undergone the treatment if he or she had been fully informed" and that "the lack of informed consent is a proximate cause of the injury" (Cole v Chun, 185 AD3d 1183, 1185 [3d Dept 2020] [internal quotation marks and citations omitted]). As there is always a risk of malpractice during any surgery, the alleged non-disclosure of the risk of malpractice is insufficient to establish these elements. Accordingly, the lack of informed consent claim is also hereby dismissed.

16

In addition, the negligence claim is not viable given that the alleged negligent conduct concerns medical care and treatment and therefore liability must be based on a theory of medical malpractice rather than negligence (see e.g. Angell v State, 278 AD2d 776, 777 [3d Dept 2000]). Similarly, the remaining claims are dependent on the underlying viability of the claims against Dr. Boyle for malpractice and lack of informed consent. As such claims against Dr. Boyle have been dismissed, the remaining claims must also be dismissed.

It is therefore,

**ORDERED**, that the defendants' motion seeking summary judgment dismissing the complaint is **GRANTED** and the complaint is hereby **DISMISSED** in its entirety.

This constitutes the Decision and Order of the Court. The Court is uploading the original for filing and entry. The Court further directs the parties to serve notice of entry of this Decision and Order in accordance with the Local Protocols for Electronic Filing for Saratoga County.

Dated: January 2, 2024
at Ballston Spa, New York

HON. RICHARD A. KUPFERMAN
Justice Supreme Court

Enter.

17