Schwenzfeier v St. Peter's Health Partners (2023 NY Slip Op 00894)

Schwenzfeier v St. Peter's Health Partners

2023 NY Slip Op 00894

Decided on February 16, 2023

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:February 16, 2023

533603
[*1]Kevin F. Schwenzfeier, as Executor of the Estate of Elaine Schwenzfeier, Deceased, Appellant,
v
St. Peter's Health Partners et al., Respondents, et al., Defendant.

Calendar Date:November 14, 2022

Before:Garry, P.J., Clark, Aarons, Pritzker and McShan, JJ.

LaMarche Safranko Law PLLC, Albany (Aimee E. Greer of counsel), for appellant.
Maguire Cardona, PC, Albany (Richard R. Maguire of counsel), for St. Peter's Health Partners and others, respondents.
Thorn Gershon Tymann and Bonnani, LLP, Albany (Erin Mead of counsel), for Deborah A. Hrustich, respondent.

McShan, J.
Appeal from that part of an order of the Supreme Court (David A. Weinstein, J.), entered April 21, 2021 in Albany County, which granted certain defendants' motions for summary judgment dismissing the complaint against them.
On November 26, 2015, Elaine Schwenzfeier (hereinafter decedent) presented at Albany Memorial Hospital — a hospital maintained and operated by defendants St. Peter's Health Partners and Memorial Hospital, Albany, N.Y. — with complaints of pain in her right hip, back and head following a fall that had occurred hours earlier. After a 16-day stay at Albany Memorial, decedent was transferred to Albany Medical Center (hereinafter AMC), where she was diagnosed with a three-column spinal fracture and subsequently underwent thoracolumbar reconstructive surgery. Following surgery, decedent developed multiple complications including, among other things, failure to thrive, acute respiratory distress syndrome, pneumonia and pericardial effusion. She later died from those complications on January 18, 2016.
Plaintiff, as executor of decedent's estate, commenced this medical malpractice action in late 2017, alleging, in sum and substance, that defendants failed to diagnose her spinal fracture and failed to properly evaluate and treat decedent during her stay at Albany Memorial. Following joinder of issue, defendant physicians — Tarukel Khan, Naeem Ahmed, Chrystal Price and Edwin Cowen — alongside St. Peter's and Memorial Hospital (hereinafter collectively referred to as the hospitalist defendants) collectively moved for summary judgment. Defendant Deborah A. Hrustich, a neurosurgeon who consulted with decedent during her stay, separately moved for summary judgment dismissing the complaint against her.[FN1] Supreme Court granted all three motions, finding, in relevant part, that both the hospitalist defendants and Hrustich had met their prima facie burden, and that plaintiff's experts' opinions were conclusory, speculative and insufficient to raise a question of fact. Plaintiff appeals from that part of the order that granted the hospitalist defendants' and Hrustich's motions for summary judgment.
As the moving parties on their respective summary judgment motions, defendants bore the initial burden of "present[ing] factual proof, generally consisting of affidavits, deposition testimony and medical records, to rebut the claim of malpractice by establishing that they complied with the accepted standard of care or did not cause any injury to the patient" (Marshall v Rosenberg, 196 AD3d 817, 818 [3d Dept 2021] [internal quotation marks and citations omitted]; see Holland v Cayuga Med. Ctr. at Ithaca, Inc., 195 AD3d 1292, 1294 [3d Dept 2021]). Turning first to the hospitalist defendants' motion, we agree with Supreme Court that their proof as presented was sufficient to satisfy their prima facie burden that they complied with accepted medical practice or that any such deviation was not the cause of plaintiff's injury.
The hospitalist defendants [*2]relied upon the expert affidavit of Elias Sakalis, a board-certified internist, who generally opined that the care provided by each of the hospitalist defendants was within the standard of care and did not cause any injury to decedent or her subsequent death, which was attributable to complications following surgery. Turning first to Cowen, who began caring for decedent the night she was admitted, Sakalis opined that it was appropriate to seek an orthopedic consultation in light of decedent's complaints of intractable pain, as were Cowen's adjustments to decedent's pain medications. According to Sakalis, it was entirely reasonable for the hospitalist defendants to rely on the orthopedists' judgment while they were treating decedent's spinal condition, "including recommendations on which radiology studies should be ordered for evaluation of the condition." While Cowen was the overnight hospitalist on duty during decedent's first few nights at Albany Memorial, a nonparty physician assistant caring for decedent during the day ordered an MRI of the lumbar spine to rule out disc herniation. The MRI report was completed by Petitti on November 30, 2015, the same day Price took charge of decedent's care. Price performed an initial evaluation, noting that decedent did not report any nausea, vomiting or loss of bowel or bladder function at that time. Price also reviewed the MRI report, which stated that "[t]here [was] no fracture or subluxation" present. Petitti's report indicated, among other things, that the images reflected that decedent suffered from moderate to severe scoliosis and had "[m]arked intervertebral disc edema at T12-L1 and L4-L5." Noting that the MRI report indicated the absence of a fracture and the finding of disc edema at T12-L1, along with decedent's lengthy history of spine issues and the absence of any focal neurologic signs suggesting the existence of a spinal cord injury, Sakalis opined that Cowen and Price acted within the standard of care by pursing a course of medicinal management to treat decedent's back pain.
As to Ahmed's care, which began on December 2, 2015, Sakalis opined that Ahmed acted properly, in light of Petitti's report and his own examination of decedent, by continuing to treat decedent's pain with medication and requesting a neurological consult from Hrustich. Further, Sakalis noted that a CT guided biopsy had ruled out infection at the L4 and L5 area of decedent's spine. According to Ahmed, the absence of infection prompted concern that swelling had increased since the November 30 MRI, prompting him to order an additional MRI of decedent's thoracic and lumbar spine, as well as an X-ray of the chest and CT scan of the brain. Sakalis opined that Ahmed's referral and continuing contact with various specialists, including orthopedics, urology, neurology, infectious disease and psychiatry, was within the standard of care based upon his observation of decedent's presentation. Sakalis further opined that Ahmed responded [*3]properly to the onset of fecal incontinence on December 8, which indicated possible spinal cord impingement, by ordering a neurology consult and planning for repeat thoracic and lumbar spine imaging. Khan took over decedent's care on the morning of December 9 and, after evaluating decedent, ordered a consultation from a neurologist and a psychiatrist. Meanwhile, the first attempt of the MRI on her lumbar/thoracic spine ordered by Ahmed was unsuccessful, as decedent's pain prevented her from undergoing the procedure and, although Khan ordered another attempt at the MRI with the use of intravenous Ativan to help decedent tolerate the procedure, decedent again could not tolerate the imaging. Sakalis noted that the neurologist who consulted decedent over the first two days Khan was on duty concluded that the source of decedent's back pain was likely radicular based upon decedent's medical history, including her scoliosis and multiple surgeries, and eventually recommended, among other things, a further neurosurgery evaluation. Sakalis opined that it was within the standard of care for Khan to rely on the various specialists that were managing decedent's spinal condition and her neurological complaints in declining to insist on a CT scan after two unsuccessful attempts to obtain an MRI of the lumbar/thoracic spine or to insist that decedent be transferred prior to December 11.
As the hospitalist defendants met their prima facie burden, "the burden shifted to plaintiff to present expert medical opinion evidence that there was a deviation from the accepted standard of care and that this departure was a proximate cause of [decedent's] injury" (Fischella v Saint Luke's Cornwall Hosp., 204 AD3d 1343, 1344 [3d Dept 2022]; see Busch v Sherman, 209 AD3d 1230, 1232 [3d Dept 2022]). "In order not to be considered speculative or conclusory, expert opinions in opposition [to a physician's motion for summary judgment] should address specific assertions made by the [physician]'s experts, setting forth an explanation of the reasoning and relying on specifically cited evidence in the record" (Tsitrin v New York Community Hosp., 154 AD3d 994, 996 [2d Dept 2017] [internal quotation marks and citations omitted]).
Based upon our review, we find that plaintiff failed to establish that the hospitalists deviated from the standard of care in their treatment of decedent. In opposition to the hospitalist defendants' motion, plaintiff submitted the affidavit of Erin Egan, a board-certified internist, who generally opined that the hospitalist defendants' care deviated from the standard of care and "caused a delay in diagnosing [decedent's] 3-column spinal fracture at T10-T11 and [T12]-L1, causing pain and suffering, the worsening of her medical condition, and ultimately her death." As to Cowen, Egan opined that he should have ordered "sufficient spinal studies," based upon decedent's presentation and the limitations of prior imaging taken while decedent was in the emergency room[*4]. However, we find that Egan's statement does not adequately address the facts in the record and the opinions of Sakalis as to why the imaging of the lumbar spine ordered by the physician assistant during this exact time frame was in any way insufficient. Moreover, while an X-ray of decedent's lumbar spine from the date she was first admitted noted that the examination was "limited by patient position and osteopenia," a CT scan of decedent's pelvis that was also taken that day did not suggest any limitation on the study and presented findings pertaining to decedent's lumbar spine. To this end, the record demonstrates that Cowen ordered an orthopedic consult the first night that he cared for decedent, and that said consult acknowledged the CT scan of decedent's pelvis and the lack of any fracture, which prompted the cancellation of a CT scan that the orthopedic consultants had themselves ordered. While Egan opines that Cowen failed to "think critically" in response to that cancellation, she fails to directly address why Cowen erred in relying on the specialist consult (see Humphrey v Riley, 163 AD3d 1313, 1315 [3d Dept 2018]).
Similarly, when Price's shift began, she reviewed and relied upon Petitti's MRI report, which was produced that day, reflected the absence of a fracture and expressed no limitations or concerns in generating that reading (see Tsitrin v New York Community Hosp., 154 AD3d at 996; Micciola v Sacchi, 36 AD3d 869, 871-872 [2d Dept 2007]; Machac v Anderson, 261 AD2d 811, 813 [3d Dept 1999]).[FN2] Although there was a discrepancy between the nursing notes and Price's observations of decedent during her initial consult, Egan does not suggest that Price was required to rely on or read the nursing notes as part of the standard of care. Egan's assertion that Price failed to properly assess decedent fails to address that Price noted decedent's symptoms based upon her independent evaluation from speaking directly to decedent. Further, while Egan suggests that the disc edema was "a finding concerning for a compression fracture," her affidavit fails to specifically address the explicit finding in Petitti's report that no fracture was present and why Price could not rely on that conclusion in considering a different cause for decedent's symptoms. Accordingly, we find that plaintiff's proof was insufficient to raise a triable issue of fact as to a deviation from the standard of care provided by Cowen and Price (see Jacob v Franklin Hosp. Med. Ctr., 188 AD3d 838, 840-841 [2d Dept 2020], affd 36 NY3d 1102 [2021]).
As to Ahmed, Egan first opines that his failure to consider that the disc edema that was indicated on the imaging, including the November 30, 2015 MRI, was the result of a spinal fracture and to order further radiological imaging was a deviation from the standard of care. However, Egan again does not directly address the fact that Petitti's MRI report unequivocally indicated that no fracture was present. While Egan notes that the edema [*5]could have been caused by a fracture or infection, she fails to address Sakalis' opinion that severe degenerative disease could also be the cause of the edema, or the testimony from the neuroradiologist at AMC that the fracture, which only became visible in the CT scan on December 11 was "rare" and appeared to have been caused after the November 30 MRI took place. Additionally, Egan's affidavit fails to address the fact that various specialists were caring for decedent at this point and offers no opinion to counter Sakalis' conclusion that, as general practitioners, it was appropriate for the hospitalist defendants to rely on the opinions of said specialists. In this respect, while Egan suggests that the biopsy of L4-L5 was not indicated based upon the lack of presentation of infection, the record demonstrates that the orthopedic consultants ordered the biopsy as part of their ongoing care of decedent's spinal complaints. Moreover, noting that Ahmed ordered an MRI after decedent began suffering from fecal incontinence, Egan suggests that the delay in doing so was a breach of the standard of care. This again fails to acknowledge that the November 30 MRI explicitly noted the absence of a fracture, and Egan does not offer any opinion as to the point in time during decedent's care when Ahmed was required to disregard that interpretation (see Coffey v Mansouri, 209 AD3d 714, 716 [2d Dept 2022]; Tsitrin v New York Community Hosp., 154 AD3d at 996).
Egan next opines that Khan's failure to consider a CT scan of the thoracic and lumbar spine after decedent could not tolerate an MRI was a deviation from the standard of care. In this respect, Egan opines that it was not reasonable to rely on the neurology consult "for the issue of altered mental status." However, this is contrary to the record evidence, which notes that Khan sought a neurology consult to assess decedent's back pain and her increasing confusion (see Browder v New York City Health & Hosps. Corp., 37 AD3d 375, 376 [1st Dept 2007]; Kaplan v Hamilton Med. Assoc., 262 AD2d 609, 610 [2d Dept 1999]). The neurology notes indicate that decedent's back pain and radiculopathy was attributable to her scoliosis and recommended that orthopedics attempt an epidural. Moreover, after a CT scan of decedent's head ruled out a stroke, the neurologist suggested further imaging and, if that could not be completed, a neurosurgery consult, which prompted Khan to contact Hrustich and eventually transfer decedent to AMC on December 11, 2015. To this end, we agree with Supreme Court that Egan's affidavit fails to articulate what the standard of care required insofar as the appropriate point in time that a transfer order was warranted, rendering her opinion conclusory and speculative (see Coffey v Mansouri, 209 AD3d at 716).
As to Hrustich's motion, we similarly find that her submission satisfied her prima facie burden (see Colon v Choi, 192 AD3d 1442, 1443 [3d Dept 2021]). John Pollina, a board-certified neurosurgeon[*6], opined that Hrustich's initial evaluation was complete and thorough, and that her review of the chart, including her reliance on Petitti's report, was within the standard of care. To this end, Pollina noted that, had Hrustich reviewed the MRI films herself, the fracture would still have not been diagnosed since there was no evidence of a fracture in the films and no change in alignment of the spine. Pollina stated that the review of the imaging, including the MRI, "confirms that on December 4, 2015, there was no acute or traumatic obvious injury that would require additional studies be ordered." Further, Pollina opined that it was appropriate for Hrustich to refer decedent for further surgical consultation as any complex spinal surgery was beyond her expertise and, consequently, that it was appropriate to defer consideration of the need for additional imaging to the specialist performing a surgical evaluation. Finally, as to causation, Pollina opined that even if the fracture was diagnosed on December 4, decedent would likely have been offered a conservative treatment course in light of the severity of her scoliosis, her comorbidities and the risks inherent in thoracolumbar reconstruction. Moreover, Pollina opined that any delay in diagnosis and surgical intervention would not definitively have prevented decedent from developing the postsurgical complications that lead to her death.
We disagree, however, with Supreme Court's determination that plaintiff failed to raise a triable issue of fact regarding Hrustich's treatment of decedent. In opposition, plaintiff submitted the affidavit of Brad Ward, a board-certified neurosurgeon, who opined that Hrustich deviated from the standard of care by relying on the reports from the various radiological studies rather than reviewing the imaging herself. More specifically, Ward notes that decedent's clinical picture, including her unresolved and severe back pain which, at the time of Hrustich's evaluation, had persisted for nine days despite the use of various pain medications, required that she correlate the studies to decedent's presentation. Plaintiff has effectively conceded that no fracture was present on any of the radiological imaging preceding Hrustich's examination, including the November 30 MRI films; however, this fact is not conclusive as to Hrustich's actions and the deviation from the standard of care that Ward posits in his affidavit. Rather, Ward notes the presence of artifact on those films that obscured the area where the fracture was located. Thus, regardless of whether Hrustich would have been justified in coming to the same conclusion as Petitti that no fracture was visible on the films, that determination would not foreclose Hrustich from also concluding that the imaging was insufficient to rule out a fracture. To this end, Ward opined that, because of the risk of an occult fracture on an MRI or X-ray, the standard of care required that Hrustich order a CT scan to definitively diagnose [*7]or rule out a fracture (see Tardi v Casler-Bladek, ___ AD3d ___, ___, 2023 NY Slip Op 00012, *2 [3d Dept 2023]). In this respect, it was not Petitti's responsibility to order further imaging as the radiologist (see Martingano v Hall, 188 AD3d 1638, 1641 [4th Dept 2020], lv denied 36 NY3d 912 [2021]); according to Ward, that duty fell upon Hrustich as the neurosurgeon who was specifically contacted to consult on decedent's spinal condition (see Reid v Soults, 138 AD3d 1087, 1090 [2d Dept 2016]; compare Leigh v Kyle, 143 AD3d 779, 781-782 [2d Dept 2016]). Ward further states that, as the consulting neurosurgeon, Hrustich was required to assess for the presence of a spinal fracture, regardless of whether she would be involved in any future surgical intervention. Notably, "[a] specialist may be held liable where a general practitioner may not" (Micciola v Sacchi, 36 AD3d at 872 [internal quotation marks and citation omitted]). Accordingly, we find that Ward's affidavit, when viewed in the light most favorable to plaintiff, adequately raises a question of fact as to whether the standard of care required Hrustich, as the consulting neurosurgeon, to review the relevant imaging films and whether she should have ordered a CT scan to adequately rule out the possibility of a fracture (see Tardi v Casler-Bladek, 2023 NY Slip Op 00012, at *2).
As to causation, Ward suggested that from December 4, 2015 until December 11, decedent's condition continued to deteriorate, which affected her "medical stability for surgery and recovery." Ward also opined that the benefits of the thoracolumbar reconstruction, which included stabilizing the spine and avoiding any ongoing neurological impairment, outweighed its risks. In this respect, the prior assessments that decedent was a poor candidate for potential surgeries to treat her scoliosis were not dispositive as to whether surgery was the preferable course to treat a fracture, which clearly presented different considerations as evidenced by the fact that the surgery was undertaken almost immediately after the fracture was identified at AMC. Accordingly, we find that Ward's affidavit sufficiently posits "that earlier surgical treatment would have provided decedent with a better outcome," and that questions of fact are raised as to "the effect of [the aforementioned] deviation[s] on decedent's health and death" (Cole v Champlain Val. Physicians' Hosp. Med. Ctr., 116 AD3d 1283, 1287-1288 [3d Dept 2014]; see Marshall v Rosenberg, 196 AD3d at 824; D'Orta v Margaretville Mem. Hosp., 154 AD3d 1229, 1233 [3d Dept 2017]).
Garry, P.J., Clark, Aarons and Pritzker, JJ., concur.
ORDERED that the order is modified, on the law, without costs, by reversing so much thereof as granted defendant Deborah A. Hrustich's motion for summary judgment dismissing the complaint against her; said motion denied; and, as so modified, affirmed.

Footnotes

Footnote 1: Defendant Nicola Petitti, a neuroradiologist, also moved for summary judgment dismissing the complaint against him, which plaintiff did not oppose.

Footnote 2: Contrary to plaintiff's contention, we find that Supreme Court properly determined that plaintiff's failure to contest Petitti's opposition was a concession as to the facts alleged by Petitti in his motion for summary judgment (see Kuehne & Nagel v Baiden, 36 NY2d 539, 544 [1975]; Arteaga v 231/249 W 39 St. Corp., 45 AD3d 320, 321 [1st Dept 2007]; Springer v Clark Publ. Co., 191 AD2d 922, 924 [3d Dept 1993], lv dismissed 82 NY2d 706 [1993]). In any event, plaintiff's submissions do not contend that Petitti's determination that no fracture was present on the MRI films from November 30, 2015 was inaccurate, which was the critical component relied upon by the hospitalist physicians caring for decedent during her stay at Albany Memorial.