| Gillespie v Black |
|---|
| 2024 NY Slip Op 34067(U) |
| November 20, 2024 |
| Supreme Court, Saratoga County |
| Docket Number: Index No. EF20201712 |
| Judge: Richard A. Kupferman |
| Cases posted with a "30000" identifier, i.e., 2013 NY Slip Op 30001(U), are republished from various New York State and local government sources, including the New York State Unified Court System's eCourts Service. |
| This opinion is uncorrected and not selected for official publication. |

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF SARATOGA

---

KIMBERLY A. GILLESPIE, individually
and as the Executrix of the
ESTATE OF JAMES D. GILLESPIE,

                    Plaintiff,

        - against -

TREVOR E. BLACK, M.D.,
THE SCHUMACHER GROUP OF NEW YORK, INC.,
NATHAN LITTAUER HOSPITAL AND NURSING HOME, and
NATHAN LITTAUER HOSPITAL ASSOCIATION,

                    Defendants.

---

**DECISION & ORDER**

Index No.:
EF20201712

Appearances:

George E. Lamarche, Esq.
LaMarche Safranko Law PLLC
987 New Loudon Road
Cohoes, New York 12047
*Attorneys for the Plaintiff*

Mark F. McAndrew, Esq.
Evan J. Lyman, Esq.
Voute, Lohrfink, McAndrew, Meisner & Roberts LLP
170 Hamilton Avenue, Suite 315
White Plains, New York 10601
*Attorneys for the Defendants,*
*Trevor E. Black, M.D. and*
*The Schumacher Group Of New York, Inc.*

Jessica L. Darrow, Esq.
Richard R. Maguire, Esq.
Burke, Scolamiero & Hurd, LLP
7 Washington Square, P.O. Box 15085
Albany, New York 12212
*Attorneys for the Defendants,*
*Nathan Littauer Hospital and Nursing Home*
*and Nathan Littauer Hospital Association*

1

KUPFERMAN, J.:

In this action, the plaintiff (the executrix of her husband's estate) seeks to recover damages for personal injuries and wrongful death based upon medical malpractice. The plaintiff alleges that her husband (James Gillespie) was improperly treated and diagnosed while at the defendant's hospital, and that this alleged malpractice resulted in his death four days later. Following discovery, the defendants now seek summary judgment dismissing the complaint.

## Background

Prior to his death, James Gillespie ("Jim") resided in Clark, New Jersey. The plaintiff ("Kimberly") testified at her deposition that sometime in December 2018 they both "had like a cold and had just like congestion, chest congestion." They were both coughing during this time. Kimberly did not remember if they had the cold on Christmas, but it was around that time. She believes that their colds had "pretty much resolved" sometime after Christmas.

On Saturday, December 29, 2018, they drove to visit Kimberly's parents in Gloversville, New York. Kimberly testified that by that time "neither one of [them] were coughing anymore." During the car ride and for the rest of the day, Jim did not make any complaints to her about his back or any pain. Kimberly's stepfather testified that he did not recall Jim complaining about any pain that day or coughing that evening.

Kimberly testified that Jim slept on her parents' couch that night. He woke her up the following morning (Sunday, December 30) around 6:00 a.m. and told her that "he was having a lot of pain in his back, his upper back, like sharp pains." She explained that "every move he made caused him to kind of groan in pain" and that he was having a "hard time with taking in a deep breath." She explained that he "was doubled over just walking into the bedroom" and that "walking in and talking was difficult for him at that moment."

2

Kimberly testified that she drove Jim that morning to Nahan Littauer Hospital, which was near her parents' house. When they arrived, they "walked up to the counter and told the person at the counter that Jim was having pain in his upper left back and that [they] needed to see a doctor." She testified that Jim showed a nurse his upper left back and informed her that he had a pain level of 9 out of 10. Jim told a nurse that he "woke up in the early morning with severe pain in his back." At the time, Kimberly and Jim could not think of a reason for the pain being experienced by Jim that morning other than their colds and coughing. Kimberly testified that when Jim was telling the nurse about his cold, she interjected and said that "you have not been coughing for a few days now." She did not recall if Jim gave a timeframe of how long he had been coughing. She believes that it is possible that Jim told the nurse that he had been coughing for three weeks.

When asked if Jim complained to anyone at the hospital about any "chest pain," Kimberly responded, "No." When asked if she remembered Jim telling anyone at the hospital that he had been having shortness of breathing, she responded, "Yes, when he took a deep breath in, it would cause pain. I don't know if that is considered shortness of breath, but that is part of what the description was." She testified that Jim described this to either the nurse or the doctor, although it could have been to both. Other than these complaints, Kimberly could not recall any other specific complaints to the nurse.

Kimberly testified that they were in the examination room for "maybe 30 minutes" before Dr. Black (the treating physician) came into the room. When asked about her recollection of Dr. Black, she testified as follows:

> "[Dr. Black] came in, and he just asked what was going on. Jim explained his pain and he did a physical exam .... [H]e pushed in the spot that hurt, where Jim was experiencing the pain and asked if it hurt, and Jim cried out, yes. And he said, 'Okay, I want to get a chest X-ray.' Those are the pieces that stand out in my mind the most. I don't remember specifically what else he might have done" (K. Gillespie Trans., at pp. 122-123).

3

When questioned further about the location of the pain examined, she testified as follows:

"Q. And where on Jim's body was the pain that he described to Dr. Black?

A. It was his upper left side of his back.

Q. Okay. So was it closer to his arm or closer to the middle of his spine?

A. It was really right in between those spots, in between the arm and the vertebrae.

Q. Okay. And how high up was it on his back?

A. It was maybe right below the shoulder blade. No, it was lower than that. It was a little bit lower than the shoulder blade, I think.

Q. Can you tell me, if you can, about how many inches below the shoulder blade it was?

A. I don't know, maybe two. I'm not sure.
…
Q. And did you see where Dr. Black pushed on Jim's back.

A. Yes, …it was on the …

Q. Okay. So would you say it would be about like halfway down the back and about a quarter of the way from the side in, does that sound accurate?

A. I think so" (K. Gillespie Trans., at p. 123-125).

After the examination, Kimberly testified that Jim was provided pain medication and then walked to another room for an x-ray. She recalled Jim breathing normal when he returned from the x-ray. She testified that Dr. Black said that the radiologist thought there might be a little pneumonia, so he prescribed a Z-Pak. Dr. Black also prescribed pain medication.

After they left the hospital, they went to a pharmacy and then back to her parents' house. Jim later went out that day to a restaurant in Amsterdam to see a football game. Several of his friends and family members joined him at the restaurant. When asked, the individuals with Jim at the restaurant testified that Jim did not complain to them during this time that he was experiencing

4

any chest pain; shortness of breath; trouble breathing; chest pressure; lightheadedness; nausea; or pain in his back, neck, jaw, or stomach.

Kimberly testified that Jim probably returned from the restaurant around 8:00 p.m. She testified that Jim continued to be in a lot of pain after his discharge from the hospital, although she did not recall him feeling short of breath. Kimberly's mother also observed him in pain. Jim did not make any complaints about his body to Kimberly's mother, but she recalled him wincing. Kimberly testified that Jim slept on a reclining chair that night because it was painful for him to lay down flat and move positions.

The following day (Monday, December 31), they drove to her sister's house in Ballston Spa. Jim at the time was not displaying any shortness of breath. He was also not complaining to her of any chest pain. That day, prior to driving to Ballston Spa, Jim did not complain to her of any pain in his neck, jaw, stomach, or arm; he did not complain of any nausea or vomiting; and he did not make any complaints of lightheadedness or breaking out in a cold sweat.

Jim continued to have pain. Kimberly testified that Jim stayed on the couch while they were at her sister's house and that he could not lay down flat. He did not display shortness of breath or trouble breathing. Kimberly's sister, Tracy, and her husband, Christopher, were at the house. Jim did not complain about pain to Tracy, but she observed him in pain. Tracy testified that the pain was on Jim's side based on the way he was moving. Christopher testified that Jim complained to him about general discomfort and pain on his side. He did not recall Jim saying anything about having shortness of breath while at his house. He also did not recall Jim complaining to him about chest pain; pain in neck, jaw, or stomach; nausea; or lightheadedness.

Kimberly testified that they drove back to their residence in New Jersey the following day (Tuesday, January 1, 2019). After they arrived back to New Jersey, Jim stayed inside the house.

5

That day Kimberly did not observe him having any shortness of breath or trouble breathing. He did not complain to her of chest pain or pressure or of any pain in his neck, stomach, jaw, or arm. He also did not make any complaints of nausea, vomiting, or light-headedness.

The next day, on Wednesday, January 2, Kimberly tried to get Jim to return to an emergency department, but Jim refused: "I had suggested that we go to our local ER because he wasn't feeling better, but he didn't want -- he said just give it another couple of days. If it is a muscle pain, just give it some time, so he refused" (K. Gillespie Trans., at pp. 91-92). That same day, Kimberly bought Cannabidiol (CBD) for Jim.

On the morning of Thursday, January 3, Kimberly testified that Jim did not make any complaints to her about any chest pain or pressure or any complaints of having trouble breathing or any shortness of breath. He did not complain of any discomfort in his neck, jaw, stomach, or arm; and he did not complain of any nausea, vomiting, or lightheadedness. Kimberly left for work around 7:30 or 8:00 a.m. and returned around 10:30 a.m. When she returned, Jim told her that the pain just went away. He said that he could lay down without pain and demonstrated for her. When he attempted to sit back up, his face went blank. She called his name, and then he came back. Then it happened again. She asked him to put his shoes on so that she could take him to the hospital. When he could not get his shoes onto his feet, she called 911.

The police officers arrived within a minute. She testified that she explained to them that Jim had been in the hospital a few days before for pain in his upper back. She also told them that today the pain went away briefly and that he was having an "absent seizure." At that point, Jim started to sweat and looked very pale. She believes that one of the officers went outside to his vehicle to retrieve oxygen for Jim.

6

Shortly thereafter the paramedics arrived. According to their records, the paramedics first assessed Jim at 11:09 a.m. His eyes were open, but he was not verbally responsive. His skin was "clammy, cyanotic, and pale." He was also described as being "ashen and diaphoretic." Per the records, the paramedics placed Jim on a cardiac monitor at 11:12 a.m., which showed a heart rate of 160 and narrow complex tachycardia. At 11:13 a.m., the monitor showed a heart rate of 158. After an IV was placed, a 12 lead EKG was performed at 11:16 a.m., which showed ST elevation in Leads II, III, and AVF. This was reported as being consistent with STEMI. By 11:20 a.m., Jim's heart rate reportedly went down to 40. By 11:24, he was reportedly inside the ambulance in an unconscious state. He was reportedly pulseless and not breathing. He began receiving assisted ventilation and chest compressions.

On arrival to the hospital, Jim continued to remain in this same condition. After further attempts to resuscitate him failed, he was pronounced dead at 12:03 p.m. from cardiac arrest. The attending physician at the hospital noted in his records that the paramedics had sent him the EKG prior to their arrival to the emergency department and that it showed "acute inferior wall and acute septal STEMI." The attending physician certified that the cause of death was an acute myocardial infarction ("heart attack"). The death certificate (signed by the attending physician) lists the cause of death as an acute myocardial infarction which began one (1) hour prior to death.

### The Defendants' Records and Witnesses

According to the defendants' medical records, Jim presented to the emergency department at 7:14 a.m. on December 30, 2018. Based on the records, he was seen in rapid triage by Brandi Maye, R.N., starting at 7:14 a.m.; seen by Dr. Black starting at 7:16 a.m.; and assessed by Stephanie Calderwood, R.N., starting at 7:19 a.m. As these witnesses did not recall meeting or

7

interacting with Jim, they testified based on the contents of the medical records, their custom and practice, and their general experience.

The triage assessment identifies the chief complaint as "rib injury." The triage nurse explained that Jim reported having a pain score of 9, with the pain located on the "left sided rib." Based on the medical records, Jim stated that he "has been sick [for] 3 weeks with coughing" and that he "developed left sided rib pain yesterday afternoon [with it being] worse last night." He also complained of "increased pain with deep breath and movement." The vital signs taken by the triage nurse noted that Jim's blood pressure was 127/74, pulse 92, respirations 18, temperature 97.9°F, and oxygen saturation 96%. The records indicate that Jim was 190 pounds and 5'11".

The triage nurse explained that, according to the record, she listened to Jim's lungs with a stethoscope and determined that his lungs were clear in all fields. She did not assess his lungs to be diminished. She explained that she would have asked Jim about his past medical history. According to the medical record, Jim did not tell her anything about his past medical history. She further explained that the chief complaint is entered electronically based on a drop-down of choices and that "you just try to find the best that matches the most appropriate." There was an option for a chief complaint of "chest pain," however, "rib injury" as opposed to "chest pain" was chosen because "the chief complaint was rib pain and the best fit was rib injury." According to the triage nurse, this was not a "chest pain complaint."

According to the medical records, Jim was seen by Dr. Black at 7:16 a.m. He noted the chief complaint as "Left lateral chest wall pain." Dr. Black's note provides, as follows:

> "53-year-old male presents complaining of pain in the left posterolateral mid to lower chest wall. Pain started in the overnight hours although patient states [he has] had a coughing illness upwards of a week and a half. No fevers. Does state some mild shortness of breath that started over the last couple of days. Pain in the lateral chest wall is worse with inspiration, worse with cough, worse with some movement. Denies lower extremity pain or swelling. Denies runny nose, denies sore throat."

8

The medical records indicate that Dr. Black reviewed the vital signs taken by the triage nurse. He opined during his testimony that he considered them to be normal. Regarding past medical history, Dr. Black testified that he asked about Jim's past medical history and that nothing was reported to him. The record contains the following entry: "Past history: no past medical history." Dr. Black also testified that, based on his custom and practice, he also asked about Jim's family medical history and that nothing pertinent was conveyed to him. He testified that if there had been any significant and relevant information conveyed to him, he would have documented it. He did not recall if he specifically asked whether Jim had any history of any early cardiac illness or diagnosis in his father or siblings, or whether he had any history of elevated cholesterol. He explained that he was not provided with any such information and that, even if he had been informed of such, it would not have been pertinent based on the patient's presentation.

The records indicate that Nurse Calderwood first assessed Jim at 7:19 a.m. She performed a respiratory assessment at that time and a cardiovascular assessment at 7:24 a.m. Based on the records, she asked Jim about his past medical history, and he did not report having any pertinent respiratory or cardiovascular history. The following entries are listed under her assessments: "Information Obtained From: Patient"; "Pertinent Respiratory Hx: None"; and "Pertinent Cardiovascular Hx: None." Based on Nurse Calderwood's testimony and the record, she did not ask about Jim's family medical history.

During the respiratory assessment, Jim complained of one or more of the following symptoms: "Short of breath, cough, wheeze, fever, chills." Nurse Calderwood determined that his breathing sounds were "clear/diminished." She testified that "diminished" means "clear, but a little faint" with "no other advantageous breath sounds." Based on her interpretation of the record, Jim "did say he had some exertional dyspnea," which is "shortness of breath on exertion." This is

9

listed under breathing pattern, which contains the following comments: "nonlabored, equal chest rise and fall. Exertional Dyspnea." His cough was described as "Dry, Occasional." His skin was warm and pink. His pain on the left side was described as "acute, discomfort."

During the cardiovascular assessment, Nurse Calderwood explained that she would have listened to heart sounds, asked if he had any chest pain, examined his skin color, and considered his temperature and pulses. Based on the medical records, Jim denied having chest pain, tightness, pressure, palpitations, vertigo, nausea, vomiting, and diaphoresis. His heart was apical rate with a regular rhythm, and no abnormal heart tones. His skin was also warm and dry with normal color.

Dr. Black also conducted a physical examination of Jim, including a respiratory examination and cardiovascular examination. The recorded findings included the following:

"**General appearance**: alert, no acute distress
…
**Respiratory**: no respiratory distress, nml [normal] breath sounds, chest wall tenderness (mid lateral left-no deformity)
**Cardiovascular**: regular rate/rhythm, heart sounds nml [normal], no murmur
…
**Back**: normal inspection, no external signs trauma
**Extremities**: non-tender, normal range of motion, normal appearance, no pedal edema
**Neuro**: … oriented x 4, normal speech
…
**Skin**: color normal, no rash, warm, dry" (Deposition Exhibit 5, NL 008).

Based on the medical records, Dr. Black testified that Jim presented to him with normal breathing sounds with no respiratory distress or shortness of breath. He testified that Jim displayed chest wall tenderness during the examination, and that Jim was experiencing a lateral chest wall musculoskeletal pain, which was reproducible on exam. He further testified that the cardiovascular examination was normal, with a regular rate and rhythm, normal heart sounds, and no murmurs detected.

10

At 8:01 a.m., Dr. Black ordered a chest x-ray and prescribed pain medication. Jim was given two tablets of the pain medication at 8:07 a.m. and then reportedly walked to radiology with a steady gait. After the x-ray, Jim then walked back to the examination room with a steady gait. Nurse Calderwood took Jim's vital signs around 8:17 a.m. Jim's blood pressure was 103/65, pulse 87, respirations 20, temperature 97.9°F, and oxygen saturation 97%. Around this time, the radiologist was reviewing the x-ray. In a report signed at 8:19 a.m., Jim's lungs were found to be "adequately expanded" with "mild patchy densities at each lung base ...." The radiologist's report lists the impression as "Mild bibasilar atelectasis or pneumonia."

After reviewing the x-ray results, Dr. Black had further discussions with Jim. Dr. Black prescribed antibiotics (Azithromycin) and pain medication (Hydrocodone/Acetaminophen). Dr. Black also recommended that Jim apply ice to the chest wall, on and off at 45 minutes intervals, repeating as much as possible for the next 24 hours, after which he could alternate heat with ice in a similar fashion. Dr. Black's comments state, as follows:

> "X-ray raises concern for pneumonia. In the setting of his clinical history ... we will choose to treat. Patient [will] be discharged with antibiotics, ongoing pain control, recommendations for conservative management of mussy skull [musculoskeletal] injury. Follow-up with primary care.
> I have shared with the patient the results of the workup. They understand the provisional nature of the diagnosis and are amenable to discharge. In my usual and customary fashion I have given instructions for return if need be."

Dr. Black's primary clinical impression was "community acquired pneumonia." His secondary clinical impression was "chest wall muscle strain." The medical records indicate that Jim had "improved" and that he was in "good" condition. The medical records indicate that Nurse Calderwood reassessed Jim at around 9:00 a.m. and that his pain had decreased to a 4 by then. Jim reportedly left the hospital at 9:02 a.m.

11

Nurse Calderwood provided Jim with discharge instructions. The instructions advised him to follow-up with his primary care provider to evaluate for improvement. Jim was also advised in the instructions to call 911 if he experienced signs of a heart attack such as pain in his chest and shortness of breath; to return to the emergency department if he experienced severe pain; and to contact his healthcare provider if his pain did not improve.

Dr. Black testified about his course of treatment that day. He explained as follows:

> "What you do with atelectasis in a gentleman who has a chest wall injury, a chest wall strain, right, he's not taking deep breaths because it hurts because he sprained and injured the muscles and the connective tissues of his chest wall, so it hurts when he takes a deep breath. If he's not taking a deep breath, then those pockets are not being filled and we can see potentially atelectasis. So the treatment is to control his pain so that he then can take deep breaths to expand the atelectasis, and potentially antibiotics if you believe it's pneumonia, again, as the radiologist represented as a possibility" (Black Trans, at pp. 213-214).

Dr. Black testified that he did not order an EKG or troponin testing because Jim's presentation was not consistent with a myocardial infarction or other cardiac etiology. He explained that Jim did not have anterior (front) chest pain. Rather, his pain was in the left posterolateral mid-to-lower chest wall, towards his back. Jim was not nauseous, and he was not sweating. His pain was worse when he coughed or took a breath. The pain was reproduceable on exam with palpation. He had a history of upper respiratory symptoms. His pain did not radiate to his jaw or arm. According to Dr. Black, this presentation was consistent with musculoskeletal pain, and inconsistent with a myocardial infarction or other cardiac condition.

During discovery, Nurse Maye and Nurse Calderwood similarly agreed that Jim's presentation was inconsistent with cardiac related pain. They (as well as Nurse Delaney, who served as Nurse Calderwood's preceptor/mentor that day) disagreed that the nursing policies required them to initiate an EKG (a/k/a ECG) or cardiac enzyme testing (troponin).

12

[* 12]

## The Defendants' Experts

The defendants have submitted affirmations from two emergency-medicine physicians who have reviewed the medical records, deposition transcripts, discovery materials, and bills of particulars. These two expert physicians have detailed the care provided at the defendant hospital, discussed the standard of care, and responded at length to the allegations set forth in the bills of particulars. Dr. Black's expert, who also has cardiac expertise, has further opined about proximate causation.

Regarding the care provided by the nurses, the hospital's expert opines that when a physician is available and begins treating a patient with normal vital signs, two minutes after arrival at the emergency department, it is appropriate and in accordance with the standard of care for the nurses to defer to the physician, who has a higher level of training and experience, as to any treatment or the performance of any testing on the patient. According to this expert, in such circumstances, the nurses and staff have a duty to carry out the physician's orders, monitor the patient when the physician is not present, and to notify the physician of any significant changes. This expert further opines that the hospital's nurses acted appropriate and in accordance with the standard of care in performing their duties and deferring to Dr. Black as to all medical decision-making. In addition, the hospital's expert has opined that the nursing policies and procedures were not applicable considering Jim's presentation and the timing of Dr. Black's involvement in the care and treatment.

Both the defendants' experts opine that Dr. Black complied with the standard of care. They further opine that an EKG and troponin test were not required based on Jim's presentation. They opine that Jim presented with noncardiac musculoskeletal chest wall pain, and that his presentation was not consistent with a myocardial infarction or other cardiac etiology. Their analysis

13

emphasizes the location of the pain, the reproducible nature of the pain, the examination conducted by Dr. Black, and Jim's symptoms. They opine that Jim did not have anterior chest pain, which is chest pain in the front of his chest. Rather, his pain was in the left posterolateral mid-to-lower chest wall, which is toward the back. Also, Jim's vital signs were normal, and he did not have cardiac related symptoms such as nausea and sweating or pain that radiated to his jaw or arm. Unlike cardiac related pain, Jim's chest wall pain was worse when he coughed or took a breath. The pain was also reproduceable on exam with palpation, which was not consistent with cardiac related pain. These experts further opine that an appropriate medical history was taken and that Jim's alleged risk factors (which Dr. Black and the nurses allegedly failed to ascertain) were irrelevant to the course of treatment considering Jim's presentation.

Additionally, Dr. Black's expert opines that Dr. Black conducted his own independent examination which confirmed normal breath sounds; no respiratory distress; and no shortness of breath. This expert further opines that it is the physician's clinical assessment of the patient - inclusive of the physician's examination, the patient's appearance, respiratory examination, respiratory rate, and oxygen saturation - which determines if there is objective evidence of shortness of breath during the examination. This expert further opines that Jim was not short of breath given his vital signs and based on his ability to walk to and from the x-ray room.

Regarding proximate causation, Dr. Black's expert opines that an EKG would not have showed anything acute or changed the treatment plan of a reasonable emergency room physician. The expert opines that Jim died of acute myocardial infarction and that such infarctions are immediately preceded by an abrupt event, such as plaque rupture or blood clot formation, which cannot be detected on an EKG until it occurs. The expert further opines that the acute myocardial infarction did not occur until 11:00 a.m. on January 3, four days after Jim was seen by Dr. Black.

14

In support of this opinion, Dr. Black's expert relies on the death certificate, which lists Jim's cause of death as an acute myocardial infarction which began one (1) hour prior to his death. In addition, this expert relies on the results of the EKG on January 3. This expert opines that the leads on the EKG (ST elevations in leads II, III, and AVF) correspond to heart damage occurring at the interior or bottom of the heart, and that the EKG showed an acute or sudden interruption in blood flow to the heart within a coronary artery that supplies oxygen to the bottom side of the heart. This expert opines that this finding would not have been present on an EKG performed 4 days earlier because the timing of an EKG appearance of this STEMI aligns with the time of the onset of cardiac symptoms, which occurred on January 3 (according to this expert).

Dr. Black's expert emphasizes the change in Jim's condition on January 3, including the episode at his home and his changed appearance (lightheadedness/diaphoretic/ashen). This expert further opines that the EKG indicates that Jim suffered an abrupt and total occlusion or blockage of a coronary blood vessel and that such changes on the EKG only occur when the coronary vessel is acutely blocked at that very moment.

In addition, Dr. Black's expert explains that there was a finding of narrow complex tachycardia on the paramedic's cardiac monitor on January 3 and that the monitor detected a rapid heart rate (158). He opines that this indicates that the heart's electrical system was still intact and functioning relatively normal at that time and that these circumstances independently confirm that there was no infarct of heart tissue on December 30, 2018.

Further, Dr. Black's expert opines that a troponin blood test on December 30 (if ordered) would have been normal, as Jim presented to the defendant hospital with non-cardiac complaints on December 30. He explains that troponin levels are not released into the blood until heart damage begins to occur and are therefore not a test which can predict future cardiac events.

15

## The Plaintiff's Experts

In opposition, the plaintiff has submitted two expert affirmations, one from an emergency medicine physician and the other from a cardiologist.[1] They have both reviewed the medical records, the plaintiff's bill of particulars, deposition testimony, the hospital's nursing policies, and the defendants' expert affirmations. The plaintiff's experts opine (in direct contrast to defendants' experts) that Jim presented at the defendant hospital on December 30 with cardiac related "chest pain" and "shortness of breath." They further opine that Dr. Black, as well as the nurses, ignored these symptoms and other cardiac related indicators, including Jim's age (53), the sudden onset and worsening of his pain, the pain level, his alleged history of hyperlipidemia (high cholesterol), and his father's alleged heart attack at age 51. They opine that based on Jim's presentation and symptoms, the standard of care required an EKG and bloodwork to test for troponin levels. They further opine that the defendants deviated from the standard of care by failing to conduct an EKG and a troponin test.

The plaintiff's emergency medicine expert further opines that the nursing policies required the nurses to initiate an EKG and bloodwork testing under the circumstances presented and that the nurses violated these nursing policies. This expert further opines that the nurses were required to follow these nursing policies regardless of Dr. Black's early involvement in the care.

The plaintiff's experts further opine that these deviations from the standard of care, as well as the alleged violation of the nursing policies, caused Jim's injuries/death. Specifically, they opine that Jim was having a heart attack on the morning of December 30, and that the results of an EKG or troponin test (had they been conducted) would have indicated such.

---

[1] Although the e-filed versions of these affirmations do not contain the physicians' names or signatures, the plaintiff has provided the Court with unredacted, signed copies of these documents.

16

The plaintiff's cardiologist expert further opines that Q waves on the EKG from January 3 show that Jim was having a heart attack on December 30; that a review of the EKG from January 3 reveals necrotic death of the heart that was in the process on December 30; that the EKG reveals that Jim had a complete blockage of one of his coronary arteries; and that Jim's symptoms and age on December 30 make it reasonable to conclude (according to this cardiologist expert) that Jim was "having a heart attack" on December 30 at the hospital, and that "he was having the same heart attack that ultimately caused his death on January 3 ...."

According to the plaintiff's cardiologist expert, Jim's "heart muscle was dying, he was having angina and lack of blood flow to the heart muscle which causes pain because the heart muscle was dying." This expert further opines, as follows: "Given his age, and his escalation of symptoms, as well as what we now know about his EKG on January 3, 2019 and that he died of a heart attack on January 3, 2019, I can say within a reasonable degree of medical certainty that had Dr. Black followed the standard of care for a 53 year old male with shortness of breath and chest pain, he would have learned that [Jim] was suffering from a heart attack on December 30 ...." Both the plaintiff's experts further opine that the failure to conduct the EKG and troponin testing deprived Jim of the opportunity for early intervention, which would have prevented his death.

———

17

## Analysis

A defendant medical provider seeking summary judgment in a medical malpractice action bears "the initial burden of presenting factual proof, generally consisting of affidavits, deposition testimony and medical records, to rebut the claim of malpractice by establishing that [he or she] complied with the accepted standard of care or did not cause any injury to the patient" (Schwenzfeier v St. Peter's Health Partners, 213 AD3d 1077, 1078 [3d Dept 2023] [internal quotation marks, brackets, and citations omitted]). If the defendant satisfies this standard, the burden then shifts to the plaintiff to "present expert medical opinion evidence that there was a deviation from the accepted standard of care and that this departure was a proximate cause of [the] injury" (id. at 1080 [internal quotation marks and citations omitted]). "[E]xpert opinions that are conclusory, speculative, or unsupported by the record are insufficient to raise triable issues of fact" (Longhi v Lewit, 187 AD3d 873, 878 [2d Dept 2020] [internal quotation marks and citation omitted]; see Schwenzfeier, 213 AD3d at 1080-1083). "In order not to be considered speculative or conclusory, expert opinions in opposition to a physician's motion for summary judgment should address specific assertions made by the physician's experts, setting forth an explanation of the reasoning and relying on specifically cited evidence in the record" (Schwenzfeier, 213 AD3d at 1080 [internal quotation marks, brackets, and citation omitted]).

Based on the submission of their expert affirmations, the deposition transcripts, and medical records, the defendants have readily satisfied their initial burden of demonstrating that they are not liable for any alleged malpractice (see e.g. id. at 1077-1079; Humphrey v Riley, 163 AD3d 1313 [3d Dept 2018]; Henry v Duncan, 169 AD3d 421 [1st Dept 2019]; Khosrova v Westermann, 109 AD3d 965 [2d Dept 2013]; Martino v Miller, 97 AD3d 1009 [3d Dept 2012]; Rossi v Arnot Ogden Med. Ctr., 268 AD2d 916 [3d Dept 2000]). These materials rebut the claim

18

of malpractice by establishing that the defendants complied with the accepted standard of care and did not cause any injury to Jim. In particular, the defendants' experts have opined that the deposition testimony and medical records are insufficient to support a finding that Jim presented to the hospital with cardiac related chest pain, shortness of breath, or any other symptoms that would have required an EKG or blood test for troponin levels. They further opine with sufficient particularity that the care and treatment provided complied with the standard of care. Dr. Black's expert further sets forth a rational, fact-based explanation regarding the lack of proximate causation. While the plaintiff has asserted in general terms that these opinions are deficient, the Court finds them detailed, rational, and well-supported by the record.

Nonetheless, in opposition to the summary judgment motions, the plaintiff has created a triable issue of fact, rendering summary judgment inappropriate (see e.g. Holland v Cayuga Med. Ctr. at Ithaca, 195 AD3d 1292 [3d Dept 2021]; Yerich v Bassett Healthcare Network, 176 AD3d 1359 [3d Dept 2019]). In contrast to the defendants' expert opinions, the plaintiff's experts have opined that the record evidence supports a finding that Jim presented to the defendant hospital with cardiac related chest pain, shortness of breath, as well as several other factors that would have required an EKG and a troponin test. Unlike the defendants' experts, the plaintiff's experts have further opined that Jim was having acute coronary syndrome on December 30 and that an EKG and blood testing would have confirmed such and resulted in life-saving cardiac care. In addition, the parties' experts disagree on the appropriate standard of care applicable to the nurses and whether the nurses violated the standard of care and nursing policies.

The parties' expert affirmations therefore present a classic difference of medical opinion. Such disagreement raises questions of credibility and of fact that are not appropriately resolved on

19

this motion (see Dillenbeck v Shovelton, 114 AD3d 1125 [3d Dept 2014]; Rosenbaum v Camps Rov Tov, 285 AD2d 894 [3d Dept 2001]).

To the extent that the defendants challenge the plaintiff's expert affirmations as deficient, the Court finds that they are facially sufficient to survive this motion, as they appropriately delineate a standard of care and cite to record facts in support of their opinions. In fact, on their surface, they are just as articulate, detailed, and fact-based as the affirmations submitted by the defendants. Moreover, the Court lacks a medical degree and therefore cannot conclude as a matter of law that the plaintiff's proximate cause analysis is medically flawed or otherwise impossible. The Court therefore denies the motions, as summary judgment is a "drastic remedy that should not be granted where there is any doubt as to the existence of triable issues of fact" (Piccirilli v. Benjamin, 196 AD3d 895, 896-897 [3d Dept 2021] [internal quotation marks and citation omitted]; see also Imbierowicz v A.O. Fox Memorial Hosp., 43 AD3d 503 [3d Dept 2007]; PJI 2:150.1 & comments [discussing the loss of chance doctrine]).[2]

The Court further notes that neither side has adequately addressed the relevancy or admissibility of the nursing policies, nor provided any case law for the Court to determine these issues. As these issues have not yet been sufficiently developed, the Court will set a briefing schedule prior to trial for the parties to address these issues further. To the extent that any such evidentiary rulings may limit the plaintiff's ability to pursue all or part of the claims based on the nurses' conduct, such issues will be addressed in a subsequent decision or at a pre-trial conference.

---

[2] The opinions from the plaintiff's experts on causation could certainly be explained in more detail. The defendants will nonetheless have the opportunity at trial to cross-examine the plaintiff's experts about the facts they believe are dispositive, as well as those the defendants believe are being disregarded, improperly weighed, or otherwise assumed without a proper evidentiary basis.

20

The Court has considered the parties' remaining contentions and finds them to be either unpersuasive or not dispositive.

It is therefore,

**ORDERED**, that the defendants' motions seeking summary judgment dismissing the complaint (Motion Nos. 2 & 3) are hereby **DENIED**; and it is further

**ORDERED**, that the parties' counsel shall appear for a pre-trial settlement conference in person at the Saratoga County Courthouse (with the plaintiff in person and the adjusters readily available by telephone) on **April 16, 2025 at 10:00 a.m.** Counsel should be prepared at the conference to discuss settlement, provide the Court with a witness list, discuss the anticipated number of days required to conduct the trial, and schedule a date certain for trial.

This constitutes the Decision and Order of the Court. No costs are awarded to any party. The Court is uploading the original for filing and entry. The Court further directs the parties to serve notice of entry of this Decision and Order in accordance with the Local Protocols for Electronic Filing for Saratoga County.

Dated: November 20, 2024
at Ballston Spa, New York

Enter.

_____
HON. RICHARD A. KUPFERMAN
Justice Supreme Court

Papers Considered: NYSCEF Doc. Nos.: 78-95, 131-213, 218-222

21

[* 21]