Naylor v Ellis Hosp. (2025 NY Slip Op 01021)

Naylor v Ellis Hosp.

2025 NY Slip Op 01021

Decided on February 20, 2025

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:February 20, 2025

CV-23-1483
[*1]Barbara Shriay Naylor, as Administrator of the Estate of Arthur Samuel Harvey Jr., Deceased, Appellant,
v
Ellis Hospital, Respondent, et al., Defendants.

Calendar Date:January 13, 2025

Before:Egan Jr., J.P., Clark, Reynolds Fitzgerald, Fisher and Mackey, JJ.

Fellows Hymowitz Rice, New City (Jillian Rosen of Pollack, Pollack, Isaac & DeCicco, LLP, New York City, of counsel), for appellant.
Heidell, Pittoni, Murphy & Bach, LLP, Albany (Marshall Broad of counsel), for respondent.

Clark, J.
Appeal from an order of the Supreme Court (Michael Cuevas, J.), entered July 10, 2023 in Schenectady County, which partially granted defendants' motion for summary judgment dismissing the amended complaint.
In the late hours of November 26, 2018, first responders in the Village of Scotia, Schenectady County found Arthur Samuel Harvey Jr. (hereinafter decedent) sitting in his vehicle. Decedent was in stable condition but had been sitting in his vehicle for several hours and appeared disoriented, as he believed that the year was 1978 and he could not remember driving to Scotia from his home in the Town of Groton, Tompkins County. Due to decedent's altered mental state, he was transported to defendant Ellis Hospital (hereinafter defendant). Upon admission to defendant's geriatric floor in the early morning hours of November 27, 2018, decedent was assessed to be a high fall risk, and certain fall prevention measures were put in place. Then, early that afternoon, a different nurse assessed decedent to be a low fall risk. The next day, around 11:45 a.m., decedent walked to the nursing station, where he suffered a neurological event, fell and struck his head on the floor. Following this fall, decedent was declared to be comatose, and he remained in such state until his death on April 19, 2019.
Plaintiff, as the administrator of decedent's estate, commenced the instant action alleging, as a first cause of action, that defendant's failure to properly assess decedent's fall risk and to provide fall prevention protocols led to decedent's injuries.[FN1] Following discovery, defendant moved for summary judgment dismissing the amended complaint, arguing, as relevant here, that it abided by the standard of care required to assess decedent's fall risk and that any deviation therefrom was not the proximate cause of decedent's injuries. Plaintiff opposed the motion. Supreme Court partially granted defendant's motion, finding that defendant had complied with the standard of care and that plaintiff had failed to raise an issue of material fact. Plaintiff appeals, as limited by her brief, from the dismissal of the first cause of action alleging medical malpractice with respect to decedent's fall.
"When considering a motion for summary judgment, courts must view the evidence in a light most favorable to the nonmoving party and accord that party the benefit of every reasonable inference from the record proof, without making any credibility determinations" (Stanhope v Burke, 220 AD3d 1122, 1123 [3d Dept 2023] [internal quotation marks and citations omitted]; see Lorica v Krug, 195 AD3d 1194, 1195 [3d Dept 2021]). A movant seeking dismissal of a medical malpractice claim bears "the initial burden of presenting factual proof, generally consisting of affidavits, deposition testimony and medical records, to rebut the claim of malpractice by establishing that they complied with the accepted standard of care or did not cause any injury to the patient" (Schwenzfeier v St. Peter's [*2]Health Partners, 213 AD3d 1077, 1078 [3d Dept 2023] [internal quotation marks, brackets and citations omitted]; see Humphrey v Riley, 163 AD3d 1313, 1314 [3d Dept 2018]). In support of its motion, defendant proffered its organizational fall prevention policy, which sets forth its procedures to assess a patient's fall risk as well as prevention measures to reduce the risk of falls. Pursuant to that policy, a patient's fall risk is assessed using a modified Morse Fall Scale (hereinafter MMFS) when a patient is admitted, when a patient is transferred to a different unit, when the patient's level of care changes and following a patient's fall. The MMFS considers a variety of categories, including, but not limited to, the patient's recent fall history or diagnosis of syncope, near syncope or other neurological or cardiac diagnosis; the patient's medication list and secondary diagnoses; the patient's use of an ambulatory aid; the patient's use of an intravenous apparatus or heparin lock; the patient's gait while transferring from one location to another; and the patient's self-assessment about his or her own ability to ambulate. The answer to each of these corresponds to a score, the aggregate of which corresponds to a fall risk category: none, low or high. Defendant's policy also sets forth various protocols that should be put in place in accordance with the patient's fall risk to prevent the patient from falling or to reduce the harm caused by a fall.
Defendant also proffered decedent's medical records and the deposition transcripts of various nurses who cared for decedent during the relevant time. Decedent's medical records show that he was admitted to defendant's geriatric unit in the early hours of November 27, 2018, and that nurse A, who was employed by defendant, assessed decedent's fall risk using the MMFS around 4:00 a.m. According to nurse A's deposition transcript, she noted that decedent had a diagnosis of syncope, near syncope or other neurological or cardiac diagnosis, another secondary diagnosis and a heparin lock, which resulted in a total score of 60 and categorized decedent as a high fall risk. Pursuant to defendant's fall prevention policy, nurse A provided decedent with a security bracelet and non-slip socks, marked decedent's fall risk in and outside decedent's room, placed a call button within his reach, instructed him on safety measures and implemented purposeful rounding. Nevertheless, nurse A attested that decedent was capable of ambulating freely within his room at that time.
Nurse B, another nurse employed by defendant, assessed decedent's fall risk on November 27, 2018 around 1:00 p.m. using the MMFS. Nurse B's assessment resulted in a total score of 35 for a secondary diagnosis and a heparin lock, categorizing decedent as a low fall risk. Nurse B could not recall which safety precautions she implemented for decedent's care but noted that the medical records reflected purposeful rounding, a call button within decedent's reach [*3]and non-slip socks. Nurse C, another nurse employed by defendant, took over caring for decedent on November 28, 2018, at 7:00 a.m. She attested that she assessed decedent's fall risk using the MMFS but did not document it. However, she recalled that decedent was ambulating independently. She explained that around 11:45 a.m., decedent walked to the nursing station and, while there, began to mumble something, fell and hit his head on the ground, at which point a rapid response team took over decedent's care.
To support its argument that it complied with the applicable standard of care, defendant relied on the expert medical opinion of Mark Graham.[FN2] Graham asserted that the MMFS is the appropriate standard of care for assessing a patient's fall risk in a hospital setting. Based on his review of decedent's medical record and the deposition transcripts, Graham noted that decedent had been able to ambulate independently, had a steady gait and had not recently fallen. As such, he opined, to a reasonable degree of medical certainty, that decedent was properly assessed to be a low fall risk. Further, Graham opined that the preventative measures implemented were appropriate under the circumstances, and that further measures would not have prevented decedent's fall, as it was precipitated by a sudden neurological event. Upon this record, we agree with Supreme Court that defendant met its initial burden of establishing, through decedent's medical records, the deposition testimony of the treating nurses and Graham's expert opinion, that defendant and its employees complied with the accepted standard of care and that any deviation therefrom was not the proximate cause of decedent's injuries (see Boltyansky v New York Community Hosp., 175 AD3d 1478, 1478 [2d Dept 2019]; Yamin v Baghel, 284 AD2d 778, 779-780 [3d Dept 2001]; Douglass v Gibson, 218 AD2d 856, 856-857 [3d Dept 1995]; compare Martir v St. Luke's-Roosevelt Hosp. Ctr., 219 AD3d 423, 424 [1st Dept 2023]). As defendant met its initial burden, the burden shifted to plaintiff, as the nonmovant, to establish that material questions of fact existed by "present[ing] expert medical opinion evidence that there was a deviation from the accepted standard of care and that this departure was a proximate cause of decedent's injury" (Schwenzfeier v St. Peter's Health Partners, 213 AD3d at 1080 [internal quotation marks, brackets and citation omitted]; see Butler v Cayuga Med. Ctr., 158 AD3d 868, 874-875 [3d Dept 2018]).
In opposition, plaintiff relied on the expert medical opinions of Joshua Davidson, a physician, and Ellen Kurtz, a registered nurse. Although plaintiff's experts agreed that the MMFS complies with the applicable standard of care, they both opined, based on their experience and education, that such assessments should be conducted approximately every 12 hours. Nurses A, B and C all testified at their respective depositions that a fall assessment should be conducted once per nursing shift.[FN3] As decedent's [*4]medical records establish that decedent's fall risk was last assessed by nurse B on November 27, 2018 around 1:00 p.m., plaintiff's experts both opined that defendant deviated from the applicable standard of care. As to the fall assessments that were conducted, Davidson and Kurtz highlighted that decedent had no memory of driving from Groton to Scotia and believed that the year was 1978, that his differential diagnoses increased his fall risk and that he demonstrated impulsive behavior, as best exemplified by his attempt to use a pocket knife to cut through his security bracelet. Consequently, plaintiff's experts opined, to a reasonable degree of medical certainty, that decedent should have been assessed as a high fall risk due to his altered mental state and for his poor self-assessment about his ability to ambulate, and that additional preventative measures such as one-on-one supervision should have been implemented. Although Davidson and Kurtz acknowledged the sudden nature of decedent's neurological event, they opined that the failure to implement such additional preventative measures proximately caused decedent's injuries, as a supervisor could have conducted an "assisted fall" to slow decedent's descent, reducing the force of the impact and, consequently, the resulting injuries (see Lubrano-Birken v Ellis Hospital, 229 AD3d 873, 879 [3d Dept 2024]; Sovocool v Cortland Regional Med. Ctr., 218 AD3d 947, 952 [3d Dept 2023]; Almonte v Shaukat, 204 AD3d 402, 404-405 [1st Dept 2022]). Based on the record evidence, plaintiff raised triable issues of fact as to whether defendant departed from the applicable standard of care in its assessment of decedent's fall risk and in implementing insufficient preventative measures and as to whether any such departure was a proximate cause of the extent of decedent's injuries (see Sovocool v Cortland Regional Med. Ctr., 218 AD3d at 952; Hranek v United Methodist Homes of Wyo. Conference, 27 AD3d 879, 880-881 [3d Dept 2006]; compare Douglass v Gibson, 218 AD2d at 857).[FN4] As such, Supreme Court should have denied the portion of defendant's summary judgment motion which sought dismissal of plaintiff's first cause of action. The parties' remaining contentions, to the extent not expressly addressed herein, have been examined and found to be without merit.
Egan Jr., J.P., Reynolds Fitzgerald, Fisher and Mackey, JJ., concur.
ORDERED that the order is modified, on the law, without costs, by reversing so much thereof as granted defendants' motion for summary judgment dismissing the first cause of action of the amended complaint; motion denied to that extent; and, as so modified, affirmed.

Footnotes

Footnote 1: Although not directly relevant on appeal, the amended complaint stated an additional cause of action sounding in medical malpractice stemming from complications following decedent's fall, as well as causes of action for negligence, premises liability, vicarious liability and wrongful death.

Footnote 2: Contrary to plaintiff's assertion, Graham possessed the professional and educational experience to render a competent medical opinion regarding the standard of care applicable to fall risk assessment and prevention (see Feinstein v Norwegian Christian Home & Health Ctr., Inc., 135 AD3d 699, 701 [2d Dept 2016]; compare Currie v Oneida Health Sys., Inc., 222 AD3d 1284, 1288 [3d Dept 2023]; Boltyansky v New York Community Hosp., 175 AD3d 1478, 1479 [2d Dept 2019]).

Footnote 3: Defendant's nursing staff worked 12-hour shifts, with a day shift working from 7:00 a.m. to 7:00 p.m. and an overnight shift working from 7:00 p.m. until 7:00 a.m.

Footnote 4: To the extent that Supreme Court considered defendant's organizational fall prevention policy as the applicable standard of care, such was error (see Diaz v New York Downtown Hosp., 99 NY2d 542, 544-545 [2002]; Feinstein v Norwegian Christian Home & Health Ctr., Inc., 135 AD3d at 701-702; see also Taylor v Appleberry, 214 AD3d 1142, 1146 n 4 [3d Dept 2023]).